516 So.2d 376 (1987)
AMOCO PRODUCTION COMPANY
v.
Herbert W. THOMPSON, Commissioner of Conservation, et al.
AMOCO PRODUCTION COMPANY
v.
Herbert W. THOMPSON, Commissioner of Conservation, et al.
CHEVRON U.S.A., INC.
v.
Herbert W. THOMPSON, Commissioner of Conservation, et al.
Nos. CA 86-0190, CA 86-1316, CA 86-1317.
Court of Appeal of Louisiana, First Circuit.
September 17, 1987.
Rehearing Denied November 13, 1987.
Writs Denied February 26, 1988.
*379 J. Clayton Johnson, Taylor, Porter, Brooks & Phillips, Baton Rouge, for plaintiff-appellant Amoco Production Co.
Veil David Devillier, Eunice, for defendant-appellee Herbert W. Thompson, Com'r of Conservation and Asst. Secretary, Office of Conservation of the State of Louisiana.
Randall C. Songy, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, for intervenor-appellant Energy Production Co.
Frederick W. Ellis, Strain, Dennis, Palmer, Mayhall & Bates, Baton Rouge, for intervenor-appellee Ray John Forrest, Beverly Rachel Janis Forrest and Silver Mount Corp.
William S. Strain, Baton Rouge, for intervenor-appellee, Sabine Corp., Frederick J. Frey, Edwin J. Leonards, Crutcher-Tufts Corp., H & W Petro-Resources, Inc., WPM Exploration, Inc., Billy R. Powell, Sam L. Pfiester, Jackson Bldg. Components, Inc., Circle Seven Oil & Gas, Inc., Royal Energy, A.R. Dike, Charles D. Saunders, Circle Seven Investments, Herlihy Exploration, MO-MC & Associates, James E. Fowler, W.E. Gene Taylor, William L. Word Co., A.C. Atkins, G. Hunter Enis, James B. Hanks, Milton Womack, James S. Jenkins, G. Allen Penniman, C. Wallace Gladney, Austin S. Bridgeforth, III, Hugh Goodrich.
Melanie M. Lewis, New Orleans, for plaintiff-appellant Chevron USA, Inc.
Before GROVER L. COVINGTON, C.J., and LANIER and ALFORD, JJ.
LANIER, Judge.
This is an appeal from a trial court judgment which affirmed an amended administrative order issued by the Commissioner of Conservation of the Department of Natural Resources of the State of Louisiana (Commissioner) which provided for the marketing of, and accounting for, the gas production of compulsory drilling and production units in a natural gas field.

BASIC FACTS
Effective October 20, 1980, and October 27, 1981, the Commissioner created nine compulsory drilling and production units for the gas reservoir denominated the 17,900' TUSC Zone, Reservoir A, in the Morganza Field (Field) located in Pointe Coupee Parish, Louisiana. Nine additional compulsory drilling and production units were thereafter established. Amoco Production Company (Amoco) was designated as the unit operator for all but one of these production units. Apparently, production has been obtained from thirteen of these units and Amoco is the unit operator for all of them.
Two mineral owners in the Field, Chevron U.S.A., Inc. (Chevron) and Energy Development Corporation (Energy), elected to take their share of the Field's gas production in kind, and Amoco delivered gas to them. Some of the mineral owners in the Field[1] did not elect to take their share of *380 the Field's gas production in kind and did not enter into operating or balancing[2] agreements with Amoco and the other mineral owners for the future sale of the gas production. Amoco entered into a contract with Columbia Gas Transmission Corporation (Columbia) on May 18, 1981, wherein Columbia agreed to buy Amoco's portion of the gas produced from the Field. The price that Amoco was to receive for this gas was relatively high because the federal government deregulated gas in 1979 and a gas shortage thereafter developed.
Apparently, Amoco commenced delivering all gas production from the Field (less that taken in kind) to Columbia. Apparently, Columbia initially agreed to buy the gas of the nonmarketing owners for an indefinite term at the same rate it paid Amoco. Apparently, the nonmarketing owners acquiesced in this arrangement. In 1982, a national gas surplus developed, and the price of gas dropped. Columbia advised Amoco that it would no longer accept delivery of the nonmarketing owners' share of the gas produced from the Field. Amoco notified the nonmarketing owners of this fact. Thereafter, Amoco delivered to Columbia and to the purchasers of the other marketing owners all of the production from the units. However, when Columbia terminated its agreement to buy the gas of the nonmarketing owners, they were left without a purchaser in a depressed market. That factual setting has caused the present dispute.

PROCEDURAL FACTS
On February 10, 1984, Amoco applied to the Commissioner for an order which would allow it to separately market its share of production from the Field and balance (give in kind at a later date) the share of the nonmarketing owners. A hearing was held on this application on March 2, 1984, by Patrick H. Martin, the Commissioner at that time. Commissioner Martin rendered his decision on March 9, 1984. Commissioner Martin found as fact that (1) there were mineral owners in the Field who did not have markets for their share of the natural gas produced from the Field; and (2) mineral owners who had markets for their share of the gas would not be able to recover their share of the gas from the Field if they were prevented from separately marketing their share of the gas. Commissioner Martin then ordered the following: (1) each mineral owner who did not have an applicable gas balancing agreement must elect to either (a) assume full responsibility for marketing his share of gas production, and, if he failed to take his share of production at the time of production, he later would be given an opportunity to receive his share of the gas on a cubic foot for cubic foot basis "at a rate not to interfere unduly with the rights of the other owners to take and market their ... shares from the pertinent unit well", or, (b) authorize the unit operator (Amoco) to sell his share of the gas production for a period of two years "on terms that are fair and reasonable and reflect the market value of the gas at the time the contract is entered into"; (2) if a mineral owner who elected option (a) failed to take his share of the gas production at the time of production, the unit operator was authorized (not mandated) to deliver all of such production "to those owners with markets"; and, (3) if the unit operator failed to market the gas for owners electing option (b), it "shall account to such owner as required by law." Finding 6 of the order provided that the order "should not supercede any contractual rights of the owners among themselves or with others."
On March 12, 1984, Herbert W. Thompson replaced Martin as Commissioner. On March 16, 1984, some of the nonmarketing owners applied to Commissioner Thompson for a rehearing, which was granted. Commissioner Thompson held a hearing on June 5, 1984. Commissioner Thompson rendered his decision on September 9, 1984. He found as fact that Commissioner Martin's *381 order (1) "does not prevent waste, but in fact will cause waste", (2) "will result, or tends to result, in reducing the quantity of gas ultimately recoverable from the pool", and (3) "fails to afford the owner of each tract the opportunity to recover or receive his just and equitable share in the pool without unnecessary expense." Commissioner Thompson ordered that (1) Commissioner Martin's order be rescinded effective its date of issuance; (2) Amoco "deliver to each owner, absent an agreement between affected owners to take in kind, his just and equitable share of the proceeds of production after repayment of any costs that may be due"; and (3) in the absence of an agreement to take in kind, Amoco and the nonmarketing owners "shall be deemed to have contracted for the operator to market all the common supply of gas", Amoco shall account to itself and the nonmarketing owners on a pro rata basis for all such sales, and this "election contracted for shall continue until the operator and the non-marketing owners may mutually agree otherwise, or until depletion."
Amoco applied for a rehearing on Commissioner Thompson's order, which was denied. Suit was filed by Amoco on December 14, 1984, requesting that Commissioner Thompson's order be rescinded and Commissioner Martin's order be reinstated. In the alternative, Amoco requested that Commissioner Thompson's order be modified to (1) be prospective only, (2) require the marketing (nonoperating) owners to account (as well as Amoco), and (3) eliminate the statements in the order indicating that there were contracts between Amoco and the nonmarketing owners for marketing.
On October 16, 1985, the trial court rendered written reasons for judgment. These reasons contain five basic holdings. First, the trial court held that Commissioner Thompson correctly held that the "molecular theory" was applicable to adjudicate the rights of the parties. The "molecular theory" means that each mineral owner in a compulsory unit is an owner in indivision of each molecule of gas produced, or, stated another way, each mineral owner in a compulsory unit owns in indivision his proportionate share of the minerals in the unit. Second, it was held that the Commissioner had jurisdiction over marketing issues to provide for the orderly development, production and utilization of the state's mineral resources to prevent waste. Third, it was found that Commissioner Thompson's order did not set forth any basis for accounting to nonmarketing owners. Fourth, Commissioner Thompson's order did not provide for an accounting by all marketing, nonoperating owners. Fifth, Commissioner Thompson's order did not provide for a reasonable election period for nonmarketing owners. On December 6, 1985, the trial court rendered what purported to be an interlocutory judgment which remanded the case to the Commissioner to (1) specify the basis on which Amoco would account to the nonmarketing owners, (2) determine if the marketing, nonoperating owners had to account to the nonmarketing owners on the same basis as Amoco, and (3) provide for a reasonable period of time for the nonmarketing owners to make the required election. The interlocutory judgment also affirmed Commissioner Thompson's order in all other respects.
Amoco took a suspensive appeal from this judgment. This court stayed action on the appeal until the Commissioner's actions on the remand were brought up on appeal.
On March 4, 1986, in compliance with the trial court's judgment, Commissioner Thompson issued an amended order which provided as follows: (1) Amoco was required to account to the nonmarketing owners on the basis of "each non-marketing owner(s) ... tract's pro rata share of the proceeds realized at the time of sale", which was defined as "the price a willing buyer would pay a willing seller of gas in an arm's length transaction under contracts negotiated for the purchase and sale of production of like kind at the time the gas is marketed"; (2) marketing, nonoperating owners were required to account to nonmarketing owners on the same basis as Amoco; and (3) nonmarketing owners (a) for past production from existing units (production prior to the effective date of the Commissioner's order) were "deemed to have elected to participate in the cost of *382 drilling and completing the well and to have the unit operator and the marketing non-operator(s) ... market his share of the gas", (b) for future production from existing units were given a period of thirty (30) days (from the effective date of the order) to elect to take their gas in kind or have Amoco market their share of production, provided that if a nonmarketing owner failed to elect he "shall be deemed" to have elected "to have his gas marketed exclusively by the unit operator", and, further provided, that if a nonmarketing owner elected to take his gas in kind the Commission would hold a hearing to determine if he could "do so without waste resulting"; and (c) for future production from future units were given thirty (30) days from the date of the order creating the unit to elect to take in kind or have the unit operator market their share of production, provided, if they elected to take in kind, the Commissioner would hold a hearing to determine if the taking in kind would result in waste. The order further provided that for future production from existing and future units where the thirty day election period had passed or where the Commissioner prohibited a nonmarketing owner from taking in kind, the unit operator would proceed with the marketing of all gas produced not subject to a marketing agreement and account on the basis previously set forth.
The nonmarketing owners asked for a rehearing to clarify the basis on which the accountings were to be made to them. On March 13, 1986, Commissioner Thompson filed supplemental reasons for his amended order in which he observed that "in most circumstances the accounting due should be based on the proceeds received for the gas", but noted that no marketing owner should enrich himself in relation to a nonmarketing owner "by taking the position that his portion of the gas is entitled to a higher price because the market price has fallen" and that a nonmarketing owner should not enrich himself in relation to a marketing owner "by taking the position that his portion of the gas is entitled to a higher than contract price because the market has risen." Commissioner Thompson denied the application for rehearing.
Amoco filed an amended petition for judicial review in its original suit. Chevron filed a separate suit for judicial review. Energy and the nonmarketing owners, which had intervened in the Amoco suit, also intervened in the Chevron suit. The Amoco and Chevron suits were consolidated.
On July 11, 1986, the trial court rendered a judgment which (1) made its interlocutory judgment final, (2) affirmed Commissioner Thompson's amended order, (3) dismissed the Amoco and Chevron suits and the Energy interventions, and (4) stayed execution of judgment until the judgment was no longer subject to appellate review.
Amoco appealed suspensively. Chevron, Energy and the nonmarketing owners appealed devolutively. The nonmarketing owners also answered both appeals.
AUTHORITY AND/OR JURISDICTION OF THE COMMISSIONER OVER GAS PRODUCED FROM A COMPULSORY UNIT
(Amoco Assignments of Error Numbers 1, 2 and 8; Chevron and Energy[3]Assignments of Error Numbers 1 and 2)
Amoco contends the Commissioner does not have jurisdiction and/or authority to order it to account to the nonmarketing owners for the proceeds of prior gas production sales from the various compulsory units, or to order it to account based on the terms it (Amoco) negotiated for the sale of its share of the gas production; and Commissioner Martin's order is legally correct and should be reinstated. Chevron and Energy contend the Commissioner does not have the power to order them as nonoperating, marketing owners to account to the nonmarketing owners for the sale of past gas production and the Commissioner does not have the power to order balancing or other agreements between Amoco (the operator) and nonoperators or among nonoperators.
*383 Interaction of the General Ownership Concepts of the Civil Code and the Provisions of the Mineral, Oil and Gas Conservation Law and the Mineral Code
A detailed analysis of the interaction of the general ownership concepts of the Civil Code and the provisions of the Mineral, Oil and Gas Conservation Law (Conservation Law) (Chapter 1 of Title 30) and the Mineral Code (Title 31) are essential to understand and properly adjudicate the serious and far-reaching issues to be decided herein. This analysis must be coupled with an understanding of the power of the Commissioner to order compulsory units and the reasons the Commissioner has been given these powers. Fortunately, the Louisiana Supreme Court has recently considered this in Nunez v. Wainoco Oil & Gas Company, 488 So.2d 955, 961-964 (La.1986) and has observed as follows:
The Commissioner has the general power and `authority over all persons and property necessary to enforce effectively the provisions of this Chapter and all other laws relating to the conservation of oil and gas.' He has specific investigative powers to determine whether or not `waste' exists or is imminent and the general authority to establish whatever rules, regulations, and orders are necessary to prevent it and to enforce the conservation laws. In recognition of the physical factors involved in the production of hydrocarbons, the Commissioner is also given the specific power to establish a drilling unit or units for each pool. Although the owners of separate tracts may `agree to pool their interest and to develop their lands as a drilling unit,' the Commissioner is authorized to `require' unwilling owners to pool their interests if he finds it necessary to prevent waste or to avoid drilling unnecessary wells. This power of forced integration has been described as `[a] necessary weapon in the enforcement of drilling patterns.'
The effects of forced pooling have been described in Mire v. Hawkins, 249 La. 278, 186 So.2d 591, 596 (1966). Forced pooling or compulsory unitization was found to convert separate interests within the drilling unit into a common interest with regard to the development of the unit and the drilling of the well. The Mire court, asked to consider whether the designation of nondrilling areas within drilling units created by the Department constituted an obstacle to the use of a mineral servitude on lands within the nondrilling areas, recognized that the effects of unit operations were `a departure from the traditional notions of servitude contemplated by the Civil Code' although they were validly imposed by law for a public purpose.
In fact, the concept of unitization, embodying the principle of ownership in minerals produced from a common source of supply, co-extensive with the individual ownership of the overlying land, is a departure from the traditional notions of private property. Ownership, defined in La.Civ.Code Ann. art. 477 as `the right that confers on a person direct, immediate, and exclusive authority over a thing,' suggests dominion and does not contemplate that others have rights to the object of ownership. According to La.Civ.Code Ann. art. 490, such exclusive authority, applies to the subsurface directly beneath a property owner's tract.
We note, however, that each of these provisions has been modified in recent years to reflect a qualification of sorts in one's rights in private property. Whereas the predecessor to La.Civ.Code Ann. art. 477 granted to the owner use of property `in the most unlimited manner, provided it is not used in any way prohibited by law or ordinances,' currently an owner may use, enjoy, and dispose of a thing only `within the limits and under the conditions established by law,' which contemplates a broader range of exceptions to an owner's exclusive authority. And, La.Civ.Code Ann. art. 490's assertion that `the ownership of a tract of land carries with it the ownership of everything that is directly above or under it' was modified in 1979 to add the phrase *384 `[u]nless otherwise provided by law.' Such a change no doubt did occur, at least in part, in recognition of the traits of subsurface minerals in liquid and gaseous form.
Those traits prompted inclusion in the Mineral Code (Title 31) of § 6 which provides:
Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership. (emphasis added) 1974 La.Acts No. 50, § 6.
Thus, it is clear that whatever the plaintiff may own under his tract, it does not include the liquid or gaseous minerals themselves. And, even the `exclusive right to explore' is qualified by the imposition of duties with regard to others who have rights in the common reservoir. La.Rev.Stat.Ann. § 31:9 and 10. As noted by a scholar on the subject, `[t]he principles of private ownership which involve dominion on the part of the landowner over all substances from the center of the earth to the heavens were inadequate to solve the problems of a substance under the earth, which would migrate to points of lower pressure caused by punctures of the reservoir by drilling.' H. Daggett, supra at 415.
And what this plaintiff does own under his tract is `subject to reasonable statutory restrictions and the reasonable exercise of the police power.' According to La.Const. art. I § 4:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Furthermore, this Court has already ruled that the Commissioner of Conservation's power to establish drilling units is a constitutional exercise of the State's police powers. Hunter Co., Inc. v. McHugh, 202 La. 97, 11 So.2d 495, 502-03 (1942) (quoting Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729 (1900)). In Ohio Oil Co. v. Indiana, the United States Supreme Court viewed a similar statute as one actually `protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others.'
Unitization is the device which the Louisiana Department of Conservation employs to protect the correlative rights of surface owners in a common reservoir, and, as discussed earlier, the device is clearly available without the consent of a particular landowner. La.Rev.Stat.Ann. § 30:10 A(1)....
Like the Oklahoma Supreme Court, we conclude that the established principles of private ownership, already found inadequate in Louisiana to deal with the problems of subsurface fugacious minerals (see Daggett, supra at 415), need not necessarily be applied to other property concepts, like trespass, within a unit created by the Department of Conservation. Unitization, which creates rights and interests in a pool of hydrocarbons beyond the traditional property lines, effectively amends La.Civ.Code art. 490 and other private property laws in the interest of conserving the natural resources of the state and, in effect, of protecting private property interests, or `correlative rights,' of nondrilling landowners. By prohibiting an individual landowner in the unit from drilling wells on their own tracts, by forcing them to share production, and by limiting the amount of hydrocarbons that can be produced, the exercise of the Commissioner's power to unitize necessarily results in infringement on the usual rights of ownership. Unitization has also resulted in changes in the legal relationships between landowners and lessees within the unit....
Therefore, we hold that the more recent legislative enactments of Title 30 and Title 31 supercede in part La.Civ. Code Ann. art. 490's general concept of

*385 ownership of the subsurface by the surface owner of land. Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently. [Footnotes omitted; bolding added.]

The Problem
The basic problem in this litigation is articulated in A. Gates, Partition of Land and Mineral Rights, 43 La.L.Rev. 1119, 1140-1141 (1983) as follows:
As noted previously, a landowner does not own the oil and gas beneath the surface of his land but merely has the right to explore for and reduce to possession the oil and gas beneath his land.137 This is called the `rule of capture,' but it has been modified somewhat by the Conservation Statute.138 The Commissioner of Conservation may create a unit139 or units to avoid the drilling of unnecessary wells and to prevent waste, each unit consisting of the maximum area which may be efficiently and economically drained by one well. Unitization modifies the rule of capture to ensure that each tract within the unit will receive its just and equitable share of production from the reservoir for which the unit was created.140 Each owner of a mineral interest in each tract included within a unit is entitled to share in the production from that unit, and this production may be `held in common' by the owners of the mineral interest.
It seems clear that oil and gas will not be reduced to possession and ownership until severance occurs at the wellhead.141 If oil is produced, each owner can easily take his share of production in kind and dispose of it in his sole discretion, subject to any contractual limitations agreed to between and among the parties involved. However, gas is not susceptible to storage or division in kind; absent an agreement between and among the co-owners of gas production, therefore, a potential problems [sic] exists regarding the management and disposition of this commonly-held property. If each co-owner owns an undivided interest in each molecule or cubic foot of gas produced from the unit well, then it could be argued that management or disposition of any of the gas requires the consent of all co-owners. On the other hand, if a co-owner of gas production has a right only to his pro rata share of production, then it could be argued that any co-owner may produce and dispose of his share of production in his sole discretion, provided sufficient gas remains in the reservoir for the remaining co-owners to obtain their pro rata shares of production.
As a practical matter, a lessee of a mineral lease generally has the right and obligation to market the gas of its lessor, and lessees will usually agree to a gas balancing agreement or a gas purchase contract prior to or shortly after a well is drilled and completed and a unit is formed. In those instances in which all of the co-owners of production have not agreed on its disposition, the use of partition may block a recalcitrant co-owner's efforts to prevent the sale or other disposition of the production. If partition is available, it will be necessary to determine exactly what property or rights are held in common, whether the property can be divided in kind by a gas balancing agreement or otherwise, and, if the property or rights are to be partitioned by licitation, whether the procedure set forth in articles 180-187 of the Mineral Code will apply.
Anyone who holds property in common with another can compel a partition of said property.142 Equitable considerations are generally not relevant in determining whether or not partition is proper. However, equitable considerations should be a factor in determining the method of partition.
136 [Harmon v. Whitten] 390 So.2d [962] at 968-69; see also Amerada Petroleum Corp. v. *386 Reese, 195 La. 359, 196 So. 558 (1940); Martin Timber Co. v. Roy, 147 So.2d 699 (La.App. 2d Cir.1962), rev'd, 244 La. 1050, 156 So.2d 435 (1963).
137 LA.R.S. 31:6-31:7 (1974); Desormeaux v. Inexco Oil Co., 298 So.2d 897 (La.App. 3d Cir.), writ refused, 302 So.2d 37 (1974).
138 LA.R.S. tit. 30 (1950).
139 `Unit' is defined in LA.R.S. 31:213(6) (Supp.1982) as follows:
`Unit' means an area of land, deposit, or deposits of minerals, stratum or strata, or pool or pools, or a part or parts thereof, as to which parties with interests therein are bound to share minerals produced on a specified basis and as to which those having the right to conduct drilling or mining operations therein are bound to share investment and operating costs on a specified basis. A unit may be formed by convention or by order of an agency of the state or federal government empowered to do so. A unit formed by order of a governmental agency is termed a `compulsory unit.'
140 LA.R.S. 30:9 (1950 & Supp.1960 & 1980).
141 LA.R.S. 47:634(3) (1950); see Sartor v. United Carbon Co., 183 La. 287, 163 So. 103 (1935); cf. Texas Co. v. Fontenot, 200 La. 753, 8 So.2d 689 (1942) (severance tax due when natural resources extracted from ground).
142 LA.CIV.CODE art. 1289. [Bolding added.]

Nature of Ownership of Gas Produced from a Compulsory Unit
The Exposé des Motifs of Title II (Ownership) of Book II (Things and the Different Modifications of Ownership) of the Civil Code defines the right of ownership as follows:
The right of ownership is in all legal systems of the free world the most important right that a private or public person may have in things. It is the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it as he sees fit but within the limits and under the conditions established by law.
See also La.C.C. art. 477. Co-ownership exists when two or more persons own the same thing in indivision, each having an undivided share. La.C.C. art. 480. Comment (b) for La.C.C. art. 480 provides as follows:
Modern civil codes contain detailed provisions dealing with coownership. Article 480 merely states a general principle, and it is left intact. The provision derives from the 1825 revision. The redactors observed: `The right of ownership consisting, as we have defined it at the head of the title, in being owner to the exclusion of all other persons, it follows that two persons cannot be owners of the whole of the same thing, but nothing prevents them from being owners in common, for the part for which each one has therein; because of the part of one in a thing in common, is not the part of the other, and each can only dispose of his own part. Pothier, de la propriete, Nos. 16, 17.' 1 Louisiana Legal Archives, Projet of the Louisiana Civil Code of 1825, p. 43 (1937).
In Steele v. Denning, 456 So.2d 992, 997 (La.1984), appears the following:
It is well settled that property may be held in indivision, that is, it may be owned jointly by more than one person, with no single person owning any particular part of the property, rather, each owning an interest in the whole. As early recognized by this Court, co-owners of land `are owners par mi et par tout, of part and of the whole. Neither of two co-owners has the exclusive right to any determinate part of the common property.' Gulf Refining Co. v. Carroll, 145 La. 299, 82 So. 277 (1919). And, with certain exceptions not pertinent here,7 each owner has the right to oppose the use of the property by the other. This principle was grounded in the Roman law, as observed by our Court in Gulf Refining Co., supra 82 So. at p. 278:
According to Sabinus one of the co-owners of a thing in common can do nothing (in re) in or concerning the thing (invito altero) against the will of, or in opposition to, the other. Hence, it is manifest that this other has the right to prohibit the doing of anything, for it is certain that the right of that one of the owners who makes opposition is the stronger.
The Court in Gulf Refining Co., supra, also noted that French law contains the same doctrine.
7. For example, this rule does not apply where one co-owner is using the property *387 to prevent waste or destruction. See La.R.S. 31:176.
The "owner" of each tract of land in a compulsory unit is entitled to the "opportunity to recover or receive his just and equitable share of the oil and gas" produced. La.R.S. 30:10(A)(1)(a). In this context, an "owner" is defined as a "person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." La. R.S. 30:3(8). A "just and equitable share" is defined as "that part of the authorized production ... which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract ... bears to the recoverable oil and gas in the total developed area...." La.R. S. 30:9(D). Ownership of the gas in a compulsory unit vests when the gas is reduced to possession, that is, when the gas is under such physical control that it can be delivered to another. La.R.S. 31:6 and 7. Commissioner's Order No. 1102-A, dated November 12, 1981, pertaining to the first nine compulsory units in the Morganza Field provides in Finding 3 that "all separately owned tracts, mineral leases and other property interests within each unit adopted herein should be forced pooled and integrated, with each separate tract sharing in unit production on a surface acre basis of participation." Nine additional compulsory units were formed on the same basis for sharing production.
It is unnecessary for purposes of this litigation to determine precisely when the gas produced from a compulsory unit is "under physical control that permits delivery to another." La.R.S. 31:7 and the official revision comment therefor. None of the parties in this litigation, including Commissioners Martin and Thompson, contend that the gas produced from a compulsory unit is not reduced to possession prior to the time that it is placed in commerce (delivered to purchasers) or that the gas is not commonly owned when initially produced. Accordingly, we hold that the gas[4] produced from a compulsory unit initially is owned in indivision and Commissioner Thompson and the trial judge were correct in applying the "molecular" theory in this case. See J. McCollam, Legal Relations Among Parties to Compulsory Units, 15th Annual Mineral Law Institute 69, 81-84 (1968).

The Nature of Ownership In Indivision
In Comment, Ownership in Indivision in Louisiana, 22 Tul.L.Rev. 611, 611-612 (1948), appears the following:
In general, the law implies from the relationship of co-owners: (1) the right to demand partition of the common property; (2) the right to enjoy the common property in a manner which does not interfere with its enjoyment by the other co-owners; (3) a standard of care which one uses in managing his own property, and a consequent reimbursement from the other co-owners for necessary expenses; (4) the right of sharing in the profits derived from the property, and the obligation of contributing to the expenses incurred in deriving the profit.

Nature of the Relationship
Roman co-proprietorship is characterized by its treatment of each co-proprietor as possessing an abstract portion of the whole, that is, a share of `each molecule' of the common property. It is a form of individual proprietorship, as opposed to the Germanic conception of co-proprietorship (le main-commune) in which the co-proprietors are treated as `only one' and there are no distinct shares, or separate patrimonies. Planiol and Ripert compare the `unorganized' nature *388 of Roman co-proprietorship, which borrows its rules from successions, partnership and proprietorship, with the organized system possible under the Germanic conception. In several important types of co-ownership, such as the marital community, partnership, and unincorporated association, the relationship of the co-owners brings the management of the property within special legislative provisions. The principal distinction between these special forms of co-ownership and simple ownership in indivision, which is the subject of this comment, is the single management of the former as opposed to the co-equality of control in the latter. [Footnotes omitted.]

Partition of Property Owned In Indivision
As previously indicated, it is a basic right of a co-owner (owner in indivision) to demand a partition of the commonly owned property. La.C.C. art. 1289. Partition is the way in which co-ownership is converted into sole ownership. Partition is a sort of exchange which co-owners make among themselves, wherein one gives up his right in the commonly owned thing for the right of the other in the thing he takes. La.C.C. art. 1382. The Civil Code creates the basic right to partition. La.C.C. arts. 1289 to 1414; Steele v. Denning, 456 So.2d at 999. The co-owners may voluntarily partition by mutual agreement. La.C.C. arts. 1294 and 1322. If all co-owners do not agree, then the partition must be made judicially. La. C.C. arts. 1294 and 1323. The preferred method of judicial partition is partition in kind, wherein each co-owner receives his proportionate share of the common property. La.C.C. art. 1337. However, partition in kind cannot be utilized when the common property is indivisible or when it cannot be conveniently divided. La.C.C. art. 1339. Common property cannot be conveniently divided in kind if a diminution of value occurs (a diminution in value occurs when the total value of the parts is less than the value of the property as a whole), or if the division in kind causes loss or inconvenience to one of the owners. La.C.C. art. 1340; A. Yiannopoulos, 2 Louisiana Civil Law Treatise, Property, § 20, p. 50 (2nd Ed.1980). If the common property cannot be partitioned in kind, it must be partitioned by licitation. La.C.C. art. 1339. Partition by licitation means a sale at public auction. La.C.C.P. art. 4607. The general procedural rules for a judicial partition are found in La.C.C.P. arts. 4601-4643. Tucker v. Kelly, 506 So.2d 730 (La.App. 1st Cir.1987).
The parties hereto have not partitioned the commonly owned gas either voluntarily or judicially as provided for in the Civil Code. The Mineral Code is not applicable because its provisions on co-ownership and partition only pertain to land and mineral rights (servitudes, leases and royalties) and do not apply to co-ownership of the minerals after they have been reduced to possession (and ownership). See La.R.S. 31:164-187. Thus, we must determine if the Conservation Law authorizes the partitioning of the commonly owned gas. If it does not, the only partition relief available to disagreeing co-owners in a compulsory unit is judicial partition.

The Commissioner's Powers
The Commissioner has jurisdiction and authority over all persons and property necessary to enforce effectively the provisions of the Conservation Law and all other laws relating to the conservation of oil or gas. La.R.S. 30:4(A). The Commissioner has the authority to make any reasonable rule, regulation and/or order that is necessary to properly administer and enforce the Conservation Law. La.R.S. 30:4(C). Specifically, the Commissioner has the power to make any rule, regulation and/or order necessary to (a) prevent wells from being drilled, operated or produced in a manner which causes injury to neighboring leases or property, (b) limit and prorate the production of oil or gas or both for the prevention of waste, and (c) regulate the spacing of wells and establish drilling units. La.R.S. 30:4(C)(3), (11) and (13). The Commissioner has the power to establish compulsory units and designate unit operators therefor. La.R.S. 30:9(B) and 30:10(A).
*389 The primary duty of the Commissioner is to prevent waste of the state's mineral resources by exercising his authority to promote the full and efficient development of these resources. La.R.S. 30:2, 3 and 4. In the exercise of this duty, the Commissioner has the power to form compulsory drilling and production units "to prevent waste or to avoid drilling unnecessary wells." La.R.S. 30:10(A)(1). All orders forming compulsory units "shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense." La.R.S. 30:10(A)(1)(a). The Commissioner may fix production allowables, but, in doing so, "shall prorate the allowable production ... so that each producer will have the opportunity to produce or receive his just and equitable share, subject to the reasonable necessities for prevention of waste." La.R.S. 30:11(B). An "equitable share" is defined in La.R.S. 30:9(D) as follows:
Subject to the reasonable necessities for the prevention of waste, and to reasonable adjustment because of structural position, a producer's just and equitable share of the oil and gas in the pool, also referred to as a tract's just and equitable share, is that part of the authorized production of the pool, whether it be the total which could be produced without any restriction on the amount of production, or whether it be an amount less than that which the pool could produce if no restriction on amount were imposed, which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool, in so far as these amounts can be practically ascertained. To that end, the rules, regulations, and orders of the commissioner shall be such as will prevent or minimize reasonably avoidable net drainage from each developed area, that is, drainage not equalized by counter drainage, and will give to each producer the opportunity to use his just and equitable share of the reservoir energy. In determining each producer's just and equitable share of the production authorized for the pool, the commissioner is authorized to give due consideration to the productivity of the well or wells located thereon, as determined by flow tests, bottom hole pressure tests, or any other practical method of testing wells and producing structures, and to consider other factors and geological and engineering tests and data as may be determined by the commissioner to be pertinent or relevant to ascertaining each producer's just and equitable share of the production and reservoir energy of the field or pool. [Bolding added.]

Partition of the Gas Produced from a Compulsory Unit
In his reasons for his order, Commissioner Martin observed that the gas produced from a compulsory unit was "commonly owned" and observed as follows:
First, there is universal acceptance in the legal community and the oil and gas industry of the principle that in a forced unit each owner may insist on taking his share of production in kind and marketing it himself on terms to his best advantage, after he has paid his share of the costs of development and operation or the operator has deducted them from the production. Indeed, there is case authority on point. ... A universally accepted corollary of the same principle is that neither the operator nor any other owner may sell the production from the unit well attributable to another owner except to the extent that it is necessary to recoup costs of development and operation. I have found no one who believes that under present law and in the absence of contract the unit operator, nor any other owner, has either the duty or the right to commit another owner's share of production from a unit to future sale.
The second step in the problem and next level of legal principle is that an owner may not unilaterally separate himself *390 from others in the unit.... Although it cannot be described as having universal acceptance, it is generally recognized that an owner (or operator) cannot on his own say he is taking `his' production and leaving other owners' share `in the ground.' It is a generally accepted proposition that an accounting is due owners who did not take their portion of the production, whether that accounting is to be by balancing in kind or by a cash payment for the value of the production. It is likewise generally accepted that an owner cannot and should not be prevented from marketing his share of production simply because another owner cannot or will not market his own share of production.
Commissioner Martin's solution to the problem was as follows:
Any owner who wishes to market his share of production from a unit well may do so with balancing to be done on a volumetric basis if he presently cannot, or does not choose to, sell his gas. Any such owner can make his own sale at his own price or make up the gas in kind later. If the owner does not elect to market his own gas, then he should not feel harmed if the unit operator is authorized to market separately the gas attributable to that non-operator's interest with accounting to be made on the basis of that separate sale. The non-selling owner does not have a right to share in the selling owner's contract, though he does have a right to an accounting in cash or kind for his share of the unit production.
The practical effect of this order was to allow the marketing owners to take their shares in kind (sole ownership), both prospectively and retroactively. This had the legal effect of converting ownership in indivision into sole ownership and effected a partition. The order also gave authority to the unit operator to separately market the shares of the nonmarketing owners for a period of two years. This private sale of the nonmarketing owner's shares converted ownership in indivision into sole ownership and effected a partition. Thus, although he did not expressly say so, apparently Commissioner Martin believed he possessed the power to partition the gas owned in indivision.
Commissioner Thompson, in his statement of reasons for his order, noted that the gas produced from a compulsory unit was owned "in indivision" and observed as follows:
On the other hand, there is substantial statutory and jurisprudential support for the position that the broad range of authority granted to the Commissioner under the provisions of Title 30 include both the authority and obligation to assume jurisdiction over marketing issues as part of the statutory scheme providing for the orderly development, production and utilization of our State's natural resources, i.e. to prevent waste. In our judgment, the answer is that the Commissioner does not have the jurisdiction to terminate the effect of co-ownership by a supplemental order allowing separate marketing because the power to partition property rests with the courts, or with our Legislature to grant this power to the Commissioner.

....
If indeed the molecular theory of gas co-ownership is the law of the State of Louisiana, which this Commissioner believes it is, then this Commissioner is firmly of the opinion that the Office of Conservation should not unilaterally attempt to alter such a well recognized principle of ownership by providing for a forced balancing of gas between unit owners, since a forced balancing is simply nothing more than transferring title to gas which is being currently produced from the non-contracted owner to the owner who has a market for his gas. The fact that the non-contracted party may have the right to produce excess volumes at a later date (assuming the reservoir is not depleted) does not change the fact that title to presently produced gas has been taken from him and vested in another without according his present right to present monetary recoupment of proceeds. This Commissioner is firmly of the opinion that such a drastic change *391 in the nature of ownership of gas should be the work of the Legislature or the courts rather than of this office.
....
Of major concern to this Office has been the specter of the non-marketing owner electing to permit the operator to market his gas and then, after the operator has committed production to a market, coming back and electing to market his own gas. The result would be no less an opportunity for waste occurring than that found to exist from permitting separate marketing under the Morganza Order. There is no easy solution. In Louisiana there is no express statutory or direct jurisprudential authority establishing the rights of an operator to market a non-operator's share of the co-owned unit production without a joint operating agreement or other contract allowing him to do so. Yet, there are many who argue that such a right is implicit or that such a conclusion is dictated by practical or public policy considerations. For our part we subscribe to the latter, i.e. that the operator has the implicit right and obligation to produce and market unit production from such time as the non-operating owner elects not to take his production in kind. In our judgment, such best serves the public policy of the State to encourage conservation of its natural resources, while protecting the correlative rights of all the parties affected as a result of statutory unitization. It is also a practical remedy.
....
In response, it is the opinion of the present Commissioner that: (1) The effect of a unit order pooling two or more separately owned tracts of land is as set forth in LSAR.S. 30:10 and that such does not create any species of co-ownership other than that previously recognized by this Office of Conservation, namely the so-called molecular theory of ownership; (2) Any owner who elects not to take his gas in kind shall be afforded the same rights of ownership to production as all other owners and he shall have the opportunity to receive his just and equitable share of the oil and gas in the pools so produced, or the proceeds of the sale thereof, after payment of costs of development and operation attributable to his portion of production; (3) Neither the operator nor any other owner of production may alter the rights of any non-operator owner to take his gas in kind or to elect to share in production, or the proceeds of the sale thereof, after payment of his share of cost of development and operation; (4) Once the election to participate in production has been made, such shall be irrevocable so as to entrust the operator with the rights necessary to exercise his duty and responsibility to market all the committed gas.
[Emphasis added.]
Commissioner Thompson fashioned his order based on the legal conclusions that (1) he did not possess the power to partition the ownership in indivision of the gas, (2) because he lacked the legal power to partition, he could not order forced balancing because this effected a partition, and (3) the unit operator has the right and obligation to market unit production when a nonmarketing owner elects not to take his share of production in kind. However, Commissioner Thompson authorized owners who wished to market (or consume) their gas to take in kind prospectively. This effected a partition. Commissioner Thompson's order also authorized the unit operator to prospectively market the shares of all nonmarketing owners. This effected a partition. Commissioner Thompson declined to make the taking in kind by the marketing owners retroactive. This implies that the co-owners of gas in the compulsory units herein (which were formed after a public hearing by orders of the Commissioner) needed orders (in addition to the orders creating the units) to prospectively partition the gas in kind.
Amoco contends Commissioner Thompson's order requires "the marketing owners to share the proceeds from the marketing of their proportionate share of production with the non-marketing owners" and this "has deprived the marketing owners of their right to recover their just and equitable share of the deliverable oil and gas *392 in the reservoir without unnecessary expense." Amoco asserts that Commissioner Martin was correct when he found that "each unitized owner had the right to take his production in kind and market it for himself."
The Commissioner has the power to establish a compulsory unit. La.R.S. 30:9(B) and 30:10(A). When this is done, a unit operator is designated to drill and produce the unit well. The order establishing the compulsory unit deprives all of the owners in the unit, except the unit operator, of the right to explore for minerals and reduce them to possession. In this context, the unit operator has become the managing owner for the purposes of exploration and production. As hereafter explained, the Commissioner also has the power (in some circumstances) to designate a managing co-owner for purposes of marketing the minerals which have been reduced to possession.
Pursuant to La.R.S. 30:3(8), an owner for purposes of the Conservation Law "means the person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." [Emphasis added.] It is significant that this statute defines the owner as the person who has the right to the production, and not just the proceeds from the sale of the production. La.R.S. 30:10(A)(1)(a) provides, in pertinent part, that all orders of the Commissioner which establish a compulsory unit "shall be upon terms and conditions ... that will afford the owner of each tract the opportunity to recover his just and equitable share of the oil and gas in the pool without unnecessary expense." [Emphasis added.] La.R. S. 30:10(A)(1)(b) provides that "[t]he portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon." [Emphasis added.] An owner's equitable share is defined in La.R.S. 30:9(D) as "that part of the authorized production of the pool ... which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool...." [Emphasis added.]
The pertinent statutes, when read in pari materia, refer to the owner's right to a share of the production (not the proceeds of the sale of production) and specifically refer to the quantity of recoverable gas. This obviously contemplates a right to take (partition) in kind to become sole owner of the equitable share (quantity of gas). La.R.S. 30:10(A)(1)(a) provides that the Commissioner shall give each owner the opportunity to recover his share (quantity of gas) without unnecessary expense. When the word shall is used in the Revised Statutes, it is mandatory. La.R.S. 1:3. Prior to establishing the compulsory units herein, the Commissioner held public hearings as required by law and complied with this mandatory duty. Order No. 1102-A establishing the first nine compulsory units in the Field provides that "all separately owned tracts, mineral leases and other property interests within each unit adopted herein should be forced pooled and integrated, with each separate tract sharing in unit production on a surface acre basis of participation." [Emphasis added.] Similar language was used to form the other compulsory units. The record before us does not show any objections to these orders. These orders are self-executing and prospectively require the unit operator to allow the mineral owners to take their shares of the gas in kind. This taking in kind effects a partition of the ownership of the gas and gives each mineral owner sole ownership of his share of gas. Because these orders were self-executing, it was unnecessary to hold an additional hearing and/or issue an additional order to authorize what the statute mandated. Such would not be consistent with the language of the statutes or the admonition therein that each owner be given his share of production without unnecessary expense.
However, this is not to imply that the right of each owner to take his share in kind is absolute, or that the Commissioner *393 is without the power, if certain facts are established, to provide for another method of partitioning the ownership of the minerals produced. In our view, partition in kind is only the preferred method of partition provided for in the Conservation Law. If taking in kind by an owner (1) causes waste [La.R.S. 30:2, 3], (2) precludes another owner from recovering or receiving his just and equitable share [La.R.S. 30:10(A)(1)(a)], or (3) infringes on the correlative rights of another owner by limiting his liberty to enjoy his rights or causes damage to him [La.R.S. 31:9, 10 and 11],[5] the Commissioner has the authority to modify or deny the right to take in kind. This power is implicit from his authority over all persons and property necessary to effectively enforce the provisions of the Conservation Law and all other laws relating to the conservation of oil or gas and to make any rule, regulation or order necessary for the proper administration and enforcement of the Conservation Law. If partition in kind is not legally possible for one, or more, of the reasons set forth above, the Commissioner has the authority to appoint a managing co-owner (who is not necessarily the unit operator)[6] for the purpose of marketing all, or part, of the gas produced from a compulsory unit. This power is a necessary corollary to the authority to partition in kind.
It is obvious that, if individual owners are allowed to take (partition) the gas in kind, some form of balancing is required. Two owners cannot take gas from one well at the same time, unless the connection to the well is split streamed. Thus, a party who wishes to take his gas in kind must be allowed, absent split streaming, to appropriate 100% of the unit gas production for a certain period of time. Each owner taking in kind has the same right to get his share of the production this way. Some type of schedule must be established to determine who will take how much and when. Because the Commissioner has the power to partition the gas in kind, he must have the power incidental thereto to order balancing, that is, allowing the marketing owners at different times and intervals to take 100% of the unit production equal to their just and equitable share at a given point in time.
Accordingly, we hold that the Conservation Law is sui generis in authorizing a special species of partition for mineral co-ownership in compulsory units and the Commissioner has the authority and/or jurisdiction to exercise this power.

Authority of the Commissioner to Order an Accounting for Gas Marketed from a Compulsory Unit
Amoco, Chevron and Energy contend the Commissioner does not have authority or jurisdiction to order them to account to the nonmarketing owners for the sales they have made of the gas produced from the compulsory units, citing Superior Oil Company v. Humble Oil and Refining Company, 257 La. 207, 241 So.2d 911 (1970); State ex rel. Superior Oil Company v. Texas Gas Transmission Corporation, 242 La. 315, 136 So.2d 55 (1961); Desormeaux v. Inexco Oil Company, 277 So. 2d 218 (La.App. 3rd Cir.1973); Anisman v. Stanolind Oil and Gas Company, 98 So. 2d 603 (La.App. 2nd Cir.1957); and Southern Natural Gas Company v. Mound *394 Company, 229 F.Supp. 422 (E.D.La.1964). They assert that the proper procedure for such an accounting is an ordinary action filed in the district court.
The Commissioner has the statutory authority to issue any order necessary to properly administer and enforce the requirement that the owner of each tract be given the opportunity to recover or receive his just and equitable share of the gas in a compulsory unit. La.R.S. 30:4(C) and 30:10(A)(1)(a). Amoco, Chevron and Energy have exercised their right to take their share of the gas production in kind and market it. After Columbia stopped buying the gas of the nonmarketing owners, they apparently have not contracted for the marketing of their shares of the gas (either because they are unable to do so or chose not to do so). As previously indicated, the right of an owner to take his gas in kind is not absolute. If the taking in kind causes waste, deprives another owner of his opportunity to take his share in kind and/or adversely affects another owner's correlative rights, the Commissioner can issue an order modifying or denying the right to take in kind. If the actions or omissions of an owner adversely affect the ability of a co-owner to get his share, an accounting in kind (by volume balancing) or an accounting in cash may be necessary for the affected owner to get his fair share. If, in taking their share in kind, some owners deplete the unit, then those owners who did not get their share in kind prior to depletion may be entitled to a cash accounting. However, if the unit is not depleted and the gas remaining in the unit is enough to provide each owner with his fair share (if properly balanced), then a balancing in kind accounting may be appropriate. It is implicit in the obligation of the Commissioner to issue orders affording each owner the right to recover his just and equitable share, that the Commissioner can order an accounting in kind for balancing purposes or an accounting in cash (if such is the only available practical relief). This is consistent with the purpose and intent of the Conservation Law and affords the affected owner the ability to obtain his just share "without unnecessary expense." We do not believe it was the intent of the Conservation Law that the Commissioner would have the authority to authorize taking minerals in kind but would be powerless to insure that such taking did not affect another owner's fair share. Thus, we hold that the Commissioner has the authority to order an accounting either in kind or in cash, depending on the circumstances.
We are not bound by the holdings in Desormeaux, Anisman, and Southern Natural Gas Company v. Mound Company and choose not to follow them. The Superior Oil Company v. Humble Oil and Refining Company case is not applicable or controlling herein because it involved a contractual dispute over the payment of well costs.
In State ex rel. Superior Oil Company v. Texas Gas Transmission Corporation, a compulsory unit in production was revised to include additional acreage. Gas produced from the unit was being sold to a pipeline by the unit operators. An owner in the additional acreage made demand on the pipeline for payment of its proportionate share of the gas produced from the unit. This request was denied, and the owner filed a suit for mandamus under La.R.S. 30:105-107 (which were repealed by Act 50 of 1974) to compel the pipeline to pay. The Louisiana Supreme Court held that the owner could obtain mandamus only if the sums due it were definite and certain, but the owner could not use the price being paid by contract to the unit operators to fix the sums due because the owner was not a party to the pipeline-unit operators' contract, and, therefore, there was no certain, definite and fixed amount due and the owner was not entitled to mandamus. This case did not squarely consider or rule on the authority of the Commissioner to order an accounting.

Conclusion
We conclude that Commissioner Thompson committed legal error when he held that he did not have the power to partition co-owned gas produced from a compulsory unit, the gas produced from the various units had not been partitioned *395 by the orders establishing the compulsory units, and he did not have the power to order balancing. Because these holdings are keystones of Commissioner Thompson's order, these errors interdict the validity of his order. Had Commissioner Thompson known he had these powers,[7] the order he ultimately rendered may have been fashioned in a different way. Ordinarily, judicial efficiency would require us to decide the merits of this case on the record before us. However, this is a case of first impression on several issues, and the Commissioner has unique expertise in the field of mineral conservation. The Commissioner is particularly suited by his expertise in this field to gather the necessary facts, weigh the various policy considerations and expeditiously make the initial determination of what is in the best interest of efficiently and fairly developing the state's mineral resources. Adequate protection is available to the parties by judicial review of the Commissioner's rulings. La.R.S. 30:12. Accordingly, we deem it preferable to remand this case to the Commissioner for reconsideration pursuant to the views expressed herein. La.C.C.P. art. 2164.
As previously indicated, the Conservation Law gives each mineral owner the right to take his share of the production (gas) in a compulsory unit in kind, unless certain criteria are established. The Commissioner's orders establishing the compulsory units herein confirmed the right of each owner to his share of unit production. Thus, on remand, the Commissioner must decide whether or not these initial orders should be changed. Since partition in kind is preferred in the Conservation Law (as well as the Civil Code) and this method of dividing the production was confirmed in the initial orders, the burden of proof on remand is on those who request another form of partition to prove the facts justifying such by a preponderance of the evidence. On remand, if the Commissioner finds as fact (based on the evidence of record)[8] that the method of partition (taking in kind) authorized in the initial orders will (1) cause waste, (2) adversely affect the right of a co-owner to take his just and equitable share of production in kind, and/or (3) adversely affect the correlative rights of a co-owner, he may issue an appropriate amending order. If an amending order is issued which requires a cash accounting, the Commissioner shall specifically set forth the method of calculating the amount due.

CONSTITUTIONALITY OF THE COMMISSIONER'S AUTHORITY

(Chevron and Energy Assignments of Error Numbers 3 and 4)
Chevron and Energy contend the power to render a money judgment is a judicial function, the power to order a cash accounting and require the payment of money is essentially rendering a money judgment, and, therefore, the legislature was barred by the Louisiana constitutional doctrine of separation of powers (La. Const. 1974, art. II) from granting this power to the Commissioner who serves in the executive branch of state government. We do not equate the power to render a money judgment with the power of the Commissioner to order an accounting in cash to insure that a co-owner gets his fair share of production from a compulsory unit and, thus, reject this contention.
Chevron and Energy also contend that, if the Conservation Law gives the Commissioner the power to order an accounting and require the payment of money, it is unconstitutional as an illegal delegation of power because it contains no standards upon which the Commissioner is *396 to act. As previously indicated, the Commissioner is mandated by statute to allow mineral owners in a compulsory unit to take their share of production in kind, unless it would cause waste, keep another owner from getting his just share of production and/or affect another owner's correlative rights. An accounting in cash could be due if an owner took in kind and depleted the unit before another owner was able to get his share in kind, or if taking in kind by some, or all, owners was not legally possible for the reasons set forth above and a managing co-owner was appointed by the Commissioner to market some, or all, of the unit's production. These are more than sufficient standards to meet constitutional muster.
These assignments of error are without merit.[9]

DECREE
For the foregoing reasons, the judgment of the trial court which affirmed Commissioner Thompson's order, as amended, is reversed; Commissioner Thompson's order, as amended, is vacated and set aside; and this action is remanded to the Commissioner for reconsideration in accordance with the views expressed herein. The cost of this appeal of $280 is assessed to the Commissioner.
REVERSED AND REMANDED.
NOTES
[1] The nonmarketing owners in this suit are Sabine Corporation, Frederick J. Frey, Edwin J. Leonards, Crutcher-Tufts Corporation, H & W Petro-Resources, Inc., WPM Exploration, Inc., Billy R. Powell, Sam L. Pfeisters, Jackson Building Components, Inc., Circle Seven Oil & Gas, Inc., Royal Energy, Ltd., A.R. Dike, Charles D. Saunders, Circle Seven Investments, Herlihy Exploration, Mo-MC & Associates, James E. Fowler, W.E. Gene Taylor, William L. Word & Co., A.C. Atkins, G. Hunter Enis, James B. Hanks, Milton Womack, James S. Jenkins, G. Allen Penniman, Jr., C. Wallace Gladney, Austin S. Bridgeforth, III and Hugh Goodrich.
[2] A balancing agreement is a type of operating agreement in which one or more mineral owners defer taking their share of the mineral production in kind until a later date.
[3] Energy has adopted the specifications of error of Chevron by reference.
[4] The ownership of the gas which has been reduced to possession in a compulsory unit must be distinguished from the ownership of the lands from which the gas has been produced and the ownership of the mineral servitudes, mineral leases and mineral royalties originating from the ownership of the lands. La.R.S. 31:6, 8, 15, 16, 21, 80 and 114. Land, a mineral servitude, a mineral royalty and a mineral lease may each be owned in indivision. La.C.C. art. 480; La.R.S. 31:168. However, there is no ownership in indivision between owners of land and the mineral servitudes, royalties and leases originating therefrom because the ownerships are not of a common thing. La.C.C. art. 480; La.R. S. 31:169.
[5] These principles, which are found in the Conservation Law and the Mineral Code, are consistent with the mutual rights and obligations of all owners in indivision. See Comment, Ownership in Indivision in Louisiana, supra.
[6] The unit operator appointed in the order creating the compulsory unit is the managing co-owner for the purposes of drilling and production. The Commissioner has authority over the marketing of the minerals only insofar as it is necessary to prevent waste, insure that each owner gets his just and equitable share, and protect the correlative rights of other owners. A managing co-owner of property owned in indivision must care for the property as he does his own property. See Comment, Ownership in Indivision in Louisiana, supra at 617-620. Thus, it would seem that, if a conflict of interest developed over marketing between the managing co-owner for drilling and production in a compulsory unit and the nonmarketing co-owners, the managing co-owner for drilling and production might be unable to meet this obligation and a separate managing co-owner for marketing the shares of the nonmarketing owners might be necessary.
[7] In Commissioner Thompson's defense, it must be noted that he was required to decide very complex and serious issues herein in a total jurisprudential void.
[8] Commissioner Thompson found as a fact that Commissioner Martin's order "will cause waste" and "will result, or tend to result, in reducing the quantity of gas ultimately recoverable from the pool." These factual findings appear to be based, in part, on portions of the Commissioner's reasons wherein he speculates about the possible future insolvency of Amoco and Amoco experiencing equipment failure after it has recovered its share of production. There are no facts in the record to support these speculations, and, thus, these speculations cannot serve as the foundations for the ultimate conclusions reached.
[9] Because we have vacated and set aside Commissioner Thompson's order, as amended, it is unnecessary for us to address the various assignments of error concerning its provisions.