566 So.2d 138 (1990)
AMOCO PRODUCTION COMPANY
v.
The Honorable Herbert W. THOMPSON, Commissioner of Conservation.
CHEVRON U.S.A., INC.
v.
Herbert W. THOMPSON, Commissioner of Conservation.
AMOCO PRODUCTION COMPANY
v.
The Honorable J. Patrick BATCHELOR, Commissioner of Conservation.
CHEVRON U.S.A., INC.
v.
J. Patrick BATCHELOR, Commissioner of Conservation.
Nos. 90 CA 0036 to 90 CA 0039.
Court of Appeal of Louisiana, First Circuit.
June 26, 1990.
Rehearing Denied August 28, 1990.
Writs Denied November 30, 1990.
*139 Tom Phillips, Baton Rouge, Jackson Cooley, New Orleans, for plaintiff-appellee Amoco Production Co.
Hampton Carver, Stephen Lastrapes, New Orleans, for plaintiff-appellee Chevron USA, Inc.
George C. Gibson, New Orleans, for defendant-appellant J. Patrick Batchelor, Com'r of Conservation.
William Strain, Baton Rouge, for intervenor-appellant Sabine Corp.
Veron Terrell, Jr., New Orleans, for appellee Conoco, Inc.
Randall Songy, Lafayette, for intervenor-appellee Energy Production Co.
*140 Before COVINGTON, C.J., WATKINS, J., and DOHERTY, J. Pro Tem.[*]
WATKINS, Judge.
This is an appeal from a trial court judgment which reversed, in part, an amended administrative order issued by the Commissioner of Conservation, Department of Natural Resources of the State of Louisiana (Commissioner), which provided for the marketing of, and accounting for, the gas production of compulsory drilling and production units in a natural gas field. The Commissioner's order was the result of a remand from this court, Amoco Production Co. v. Thompson, 516 So.2d 376 (La. App. 1st Cir.1987), writs denied, 520 So.2d 118 (La.1988). The issue before us is whether the Commissioner complied with the requirements of our previous decision when he ordered an accounting in cash for a specified period of time during which the units were produced.
The facts and history of the case are set out in our previous opinion:
Effective October 20, 1980, and October 27, 1981, the Commissioner created nine compulsory drilling and production units for the gas reservoir denominated the 17,900' TUSC Zone, Reservoir A, in the Morganza Field (Field) located in Pointe Coupee Parish, Louisiana. Nine additional compulsory drilling and production units were thereafter established. Amoco Production Company (Amoco) was designated as the unit operator for all but one of these production units. Apparently, production has been obtained from thirteen of these units and Amoco is the unit operator for all of them.
Two mineral owners in the Field, Chevron U.S.A., Inc. (Chevron) and Energy Development Corporation (Energy), elected to take their share of the Field's gas production in kind, and Amoco delivered gas to them. Some of the mineral owners in the Field1 did not elect to take their share of the Field's gas production in kind and did not enter into operating or balancing2 agreements with Amoco and the other mineral owners for the future sale of the gas production. Amoco entered into a contract with Columbia Gas Transmission Corporation (Columbia) on May 18, 1981, wherein Columbia agreed to buy Amoco's portion of the gas produced from the Field. The price that Amoco was to receive for this gas was relatively high because the federal government deregulated gas in 1979 and a gas shortage thereafter developed.
Apparently, Amoco commenced delivering all gas production from the Field (less that taken in kind) to Columbia. Apparently, Columbia initially agreed to buy the gas of the nonmarketing owners for an indefinite term at the same rate it paid Amoco. Apparently, the nonmarketing owners acquiesced in this arrangement. In 1982, a national gas surplus developed, and the price of gas dropped. Columbia advised Amoco that it would no longer accept delivery of the nonmarketing owners' share of the gas produced from the Field. Amoco notified the nonmarketing owners of this fact. Thereafter, Amoco delivered to Columbia and to the purchasers of the other marketing owners all of the production from the units. However, when Columbia terminated its agreement to buy the gas of the nonmarketing owners, they were left without a purchaser in a depressed market. This factual setting has caused the present dispute.
. . . . .
On February 10, 1984, Amoco applied to the Commissioner for an order which would allow it to separately market its share of production from the Field and balance (give in kind at a later date) the share of the nonmarketing owners. A hearing was held on this application on March 2, 1984, by Patrick H. Martin, the Commissioner at that time. Commissioner Martin rendered his decision on March 9, 1984. Commissioner Martin found as *141 fact that (1) there were mineral owners in the Field who did not have markets for their share of the natural gas produced from the Field; and (2) mineral owners who had markets for their share of the gas would not be able to recover their share of the gas from the Field if they were prevented from separately marketing their share of the gas....
On March 12, 1984, Herbert W. Thompson replaced Martin as Commissioner. On March 16, 1984, some of the nonmarketing owners applied to Commissioner Thompson for a rehearing, which was granted. Commissioner Thompson held a hearing on June 5, 1984. Commissioner Thompson rendered his decision of September 9, 1984.... Commissioner Thompson ordered that (1) commissioner Martin's order be rescinded effective its date of issuance; (2) Amoco "deliver to each owner, absent an agreement between affected owners to take in kind, his just and equitable share of the proceeds of production after repayment of any costs that may be due"; and (3) in the absence of an agreement to take in kind, Amoco and the nonmarketing owners "shall be deemed to have contracted for the operator to market all the common supply of gas", Amoco shall account to itself and the nonmarketing owners on a pro rata basis for all such sales, and this "election contracted for shall continue until the operator and the non-marketing owners may mutually agree otherwise, or until depletion."
. . . . .
Suit was filed by Amoco on December 14, 1984, requesting that Commissioner Thompson's order be rescinded and Commissioner Martin's order be reinstated....
. . . . .
On December 6, 1985, the trial court rendered what purported to be an interlocutory judgment which remanded the case to the Commissioner ... [for additional findings related to the basis of accounting.] The interlocutory judgment also affirmed Commissioner Thompson's order in all other respects.
. . . . .
On March 4, 1986, in compliance with the trial court's judgment, Commissioner Thompson issued an amended order....
. . . . .
Amoco filed an amended petition for judicial review in its original suit. Chevron filed a separate suit for judicial review. Energy and the nonmarketing owners, which had intervened in the Amoco suit, also intervened in the Chevron suit. The Amoco and Chevron suits were consolidated.
On July 11, 1986, the trial court rendered a judgment which (1) made its interlocutory judgment final, (2) affirmed Commissioner Thompson's amended order, (3) dismissed the Amoco and Chevron suits and the Energy interventions, and (4) stayed execution of judgment until the judgment was no longer subject to appellate review.
Amoco appealed suspensively. Chevron, Energy and the nonmarketing owners appealed devolutively. The nonmarketing owners also answered both appeals.
1 The nonmarketing owners in this suit are Sabine Corporation, Frederick J. Frey, Edwin J. Leonards, Crutcher-Tufts Corporation, H & W Petro-Resources, Inc., WPM Exploration, Inc., Billy R. Powell, Sam L. Pfeisters, Jackson Building Components, Inc., Circle Seven Oil & Gas, Inc., Royal Energy, Ltd., A.R. Dike, Charles D. Saunders, Circle Seven Investments, Herlihy Exploration, Mo-MC & Associates, James E. Fowler, W.E. Gene Taylor, William L. Word & Co., A.C. Atkins, G. Hunter Enis, James B. Hanks, Milton Womack, James S. Jenkins, G. Allen Penniman, Jr., C. Wallace Gladney, Austin S. Bridgeforth, III and Hugh Goodrich.
2 A balancing agreement is a type of operating agreement in which one or more mineral owners defer taking their share of the mineral production in kind until a later date.
516 So.2d at 379-382.
In our previous opinion we held that the conservation law is sui generis in authorizing a special species of partition for mineral co-ownership in compulsory units and that the Commissioner has the authority to exercise this power. We concluded that Commissioner Thompson committed legal error when he held that he did not have the *142 power to partition co-owned gas produced from a compulsory unit, that the gas produced from the various units had not been partitioned by the orders establishing the compulsory units, and that he did not have the power to order balancing. Deferring to the Commissioner's "unique expertise in the field of mineral conservation," we declined to decide the case in the furtherance of judicial economy; we remanded the case to the Commissioner for reconsideration pursuant to our views. In so doing, we noted:
The Commissioner is particularly suited by his expertise in this field to gather the necessary facts, weigh the various policy considerations and expeditiously make the initial determination of what is in the best interest of efficiently and fairly developing the state's mineral resources.
516 So.2d at 395.
Subsequent to a public hearing on September 26, 1988, the Commissioner issued the following findings referred to as the "Supplement" by the court below:
1. That Office of Conservation Orders in the 1102 Series established a number of units in the Morganza Field for the 17,900' Tuscaloosa Zone, Reservoir A, including the units designated 17900 TUSC RA SUA, SUB, SUC, SUH, SUI, SUJ, SUL, SUP, SUO, SUR, SUT, SUU, SUV AND SUX, force pooled and integrated all separately owned interests, and provided for sharing in unit production on a surface acre basis of participation.
2. That said Orders require the unit operator therein designated to allow the owners to take in kind their shares of the unit production, owned in indivision upon capture, which taking in kind effects a partition of the ownership of the unit gas produced and gives each owner sole ownership of his share of gas.
3. That, as mandated by the Court decision, the Commissioner has the authority to modify or deny the right to take in kind under certain circumstances.
4. That commencing with initial production some owners did not take in kind their shares, and some owners did take in kind their shares as well as the shares of the non-taking owners; that as a result thereof certain owners are overproduced in that their total production taken is in excess of their shares, and others are underproduced in that their total production taken is less than their shares.
5. That certain of the owners have entered into contractual arrangements for the balancing of production, but certain underproduced owners have not, and have now requested an accounting from the overproduced owners in cash rather than the preferred accounting in kind by volume balancing, claiming that accounting in kind will cause waste, adversely affect their rights to take their just and equitable shares in kind, and/or adversely affect their correlative rights.
6. That the evidence in the record, under Docket Nos. 84-167 and 84-330, together with the evidence presented at this public hearing, discloses that:
(a) The operator of the units, Amoco Production Company, a major owner in the Morganza Field, entered into a gas sales contract on May 18, 1981 with Columbia Gas Transmission Corporation.
(b) Two owners, in addition to the operator, Amoco Production Company, namely Chevron USA Inc. and Energy Development Corporation, elected to and did take their shares in kind and separately market, but certain other owners, namely, Sabine Corporation, Crutcher-Tufts Corporation, WPM Exploration Inc., Billy R. Powell, Sam L. Pfeisters, Jackson Building Components Inc., Circle Seven Oil & Gas Inc., Royal Energy Ltd., A.R. Dike, Charles D. Saunders, Circle Seven Investments, James E. Fowler, W.E. Gene Taylor, William L. Word & Co., A.C. Atkins, G. Hunter Enis, James B. Hanks, Milton Womack, James S. Jenkins, G. Allen Penniman, Jr., C. Wallace Gladney, Austin S. Bridgeworth, and Hugh R. Goodrich, hereinafter referred to as non-taking owners, did not elect to take their shares in kind, did not enter into contractual arrangements *143 for the balancing of production and now seek accounting in cash for their underproduction, as stated in Finding No. 5.
(c) Amoco Production Company, as an owner and operator, commenced in 1982 delivering all gas production from the units (and the field), less that taken in kind, [by Chevron and Energy] to its market, Columbia, in keeping with industry custom and practice, accounting in its books to the non-taking owners on the basis of the price received. Both Columbia and the non-taking owners acquiesed in this arrangement.
(d) The Amoco market provided a relatively high price for gas, and, therefore, was attractive both to Amoco and the non-taking owners.
(e) In late 1982 and 1983, severe changes occurred in the national gas market, and in late 1983 Columbia notified Amoco that it would accept delivery of only Amoco's share of the gas. Amoco, in turn, notified the affected owners, who were left with no purchaser in a depressed gas market.
(f) Notwithstanding the notices, Amoco continued to deliver all gas production, less that taken in kind, [by Chevron and Energy] to its market until 1987, during which year the non-taking owners commenced taking in kind and separately marketing their shares of the gas production.
(g) During the period from the notices in late 1983, through 1984 and 1985, the Amoco/Columbia gas market remained around $7.00 to $7.50 until December, 1985, at which time the price dropped to the $3.00 range after contract revision. Since that time the price has continued to decline.
(h) In late 1983 or early 1984 Amoco initiated these proceedings seeking approval of separately marketing its share; the initial order by Commissioner Martin, indicating volume balancing, issued March 9, 1984, and the second order, by Commissioner Thompson, indicating cash balancing, after rehearing, issued on September 9, 1984; and thereafter Amoco sought judicial review. The period commencing in late 1983 running through 1984, 1985, 1986, 1987 and until final judicial decision in 1988 was marked by confusion.
(i) Possibly during 1984, and certainly in 1985, short term sales or spot market opportunities were available to the non-taking owners, or at least to some of them, at prices in the $3.00 to $3.25 range.
(j) During the entire period of production, Amoco Production Company, as operator, following industry custom and practice, charged all owners, including the non-taking owners, operating expenses on the basis of "entitlements", their share of ownership, and has credited all owners for liquids and facilities gas on the same basis.
(k) During the entire production period the interests or share of the non-marketing owners, individually and collectively, were very small compared to the shares of the three marketing owners.
(l) At the present time, 1988, when any volume balancing could commence, the current market price in the field is in the $1.50 to $2.00 range.
7. That the combination of industry custom of marketing the non-taking owners' shares by the unit operator, the industry custom of charging expenses and crediting liquids on the entitlement basis for all owners, including non-taking owners, together with the sequence of events and marketing facts here present, disclose that the non-taking owners did not have a viable market during the critical period from the Amoco notice in late 1983 until the end of 1985, when the entire market crumbled into a "spot market" environment.
8. That for the critical period ending in 1985, partition in kind would adversely affect the rights of the non-taking owners to take their just and equitable shares in kind, and would adversely affect their correlative rights; and that an accounting in cash should be made by the overproduced owner or owners for that period.

*144 9. That for underproduction after December 31, 1985, the overproduced owner or owners should make an accounting in kind by volume balancing.
Pursuant to the quoted findings, the Commissioner issued an order on December 14, 1988, commanding, in part, that:
Any owner or owners who marketed gas from the units in question during the period from the date of first production through December 31, 1985, and who was over-produced on December 31, 1985, shall account proportionately to each non-taking owner who is not a party to balancing agreement, and was underproduced on December 31, 1985, for his share in cash, based upon the actual price received on a month to month basis, and on a unit by unit basis.
Amoco, Chevron, and Energy sought judicial review of the Commissioner's 1988 order, challenging the cash accounting ordered. On October 10, 1989, the trial court rendered judgment reversing that portion of the Commissioner's order which mandated a cash accounting.
Judicial review of an order of the Commissioner is invoked pursuant to LSA-R.S. 30:12. The district court had the power to reverse or modify the decision of the Commissioner if substantial rights were prejudiced because the Commissioner's findings or decisions were:
1. in violation of constitutional or statutory provisions;
2. in excess of his statutory authority;
3. made upon unlawful procedure;
4. affected by other error of law;
5. arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
6. manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record.
LSA-R.S. 30:12 B.(5).[1]
The district court's judgment contains the following paragraph:
Under the decision in Amoco Production Co. v. Thompson, 516 So.2d 376 (La.App. 1st Cir.), writ denied, 520 So.2d 118 (La.1988), the Supplement is contrary to statutory provisions, in excess of statutory authority, and affected by error of law.
The court was apparently tracking the language of the statute. However, the court failed to specify, either in the judgment or in the oral reasons for judgment, which statutory provisions and statutory authority were violated. Consequently, the only conclusion of the district court we will address is its conclusion that the Commissioner's order was tainted with an error of law consisting of a misinterpretation of the Amoco opinion.
In his oral reasons for judgment, the trial judge explained his interpretation of our previous opinion:
My understanding of the Court of Appeals' (sic) decision is if you run out of gas and there's no way to partition in kind because there's nothing left for the landowners to produce thereafter to make up their proportion, then you divide up the money. But if there is enough gas left in the ground to make up the "in kind" amount of gas which the nonproducing owners have not been able to produce, then they are given the right to produce gas thereafter until they make up the amount of gas to even up with the other owners. That's my understanding of what the Court of Appeals (sic) meant.
If we had intended that well depletion, which is an example of a circumstance that can warrant a cash accounting, were to be the sole criterion for allowance of a cash accounting, it would have been unnecessary for us to remand the case for the inclusion of the Commissioner's expertise. The amount of gas remaining in a well is a fact which can ordinarily be satisfactorily calculated, and the record will either reveal depletion or it will not. No discretion or balancing of interests is necessary.
*145 Thus, it was the trial judge, not the Commissioner, who misinterpreted our previous decision. The Commissioner determined that the non-taking owners were entitled to a cash accounting for the specified time period because the facts of the case satisfied the test we established, as follows:
In our view, partition in kind is only the preferred method of partition provided for in the Conservation Law. If taking in kind by an owner (1) causes waste (La.R.S. 30:2,3), (2) precludes another owner from recovering or receiving his just and equitable share (La.R.S. 30:10(A)(1)(a)), or (3) infringes on the correlative rights of another owner by limiting his liberty to enjoy his rights or causes damage to him (La.R.S. 31:9, 10 and 11), the Commission has the authority to modify or deny the right to take in kind.
516 So.2d at 393.
But the trial court did not stop with concluding that the Amoco decision had not been followed. The judge, in his oral reasons for judgment, in addition to the conclusion previously quoted, implied that he viewed the Commissioner's decision as a division of the proceeds from the sale of gas (as opposed to the gas production), which division was based merely on equity and not on what was in the best interest of efficient and fair development of the state's mineral resources.
It is fundamental that the district court must not weigh de novo the evidence presented to the Commissioner and substitute its judgment for that of the Commissioner. See Save Ourselves, Inc. v. Louisiana Environmental Control Comm., 452 So.2d 1152 (La.1984). Regrettably, it appears that the court below did exactly what it is powerless to do.
Consequently, we vacate the trial court's erroneous judgment and perform a review of the Commissioner's findings and conclusions as though they were before us on an initial judicial review.
Reviewing courts should not reverse a substantive decision by the Commissioner on its merits, unless it be shown that the balancing of costs and benefits performed by the Commissioner was achieved arbitrarily or with insufficient consideration of public and private interests. See Save Ourselves Inc. v. Louisiana Environmental Control Comm., supra. "The manifest error test ... is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion." Save Ourselves, Inc. v. Louisiana Environmental Control Comm., supra at 1159.
In the instant case we must apply both tests: the manifest error test to the Commissioner's factual finding that the rights of the non-taking owners were adversely affected because they did not have a market, during the crucial period;[2] the arbitrariness test to the Commissioner's conclusion that accounting in cash was appropriate to protect the non-taking owners' correlative rights.
On appeal the intervening non-taking owners argue that the record from all the previous hearings before the Commissioners is replete with testimony that the intervenors did not have a "viable market" for their gas. We agree. It must be kept in mind that we are not talking about price alone. By "viable market" we meanand we are convinced the Commissioner meantthat the owners of small interests could not find anyone to buy their gas separate and apart from the gas which Amoco, Chevron, and Energy were taking out. There was no investor willing and able to build a pipeline and a plant to *146 capture the small amount belonging to the non-taking owners. Amoco already had the facilities to capture the gas, but when Columbia cut back on the volume of gas it would accept under its contract with Amoco, the non-taking owners were left without a market. Thus, the raison d'etre for intervenors' non-taking was not the drop in gas prices but circumstances beyond the control of the non-taking owners.
We conclude that the Commissioner was not clearly wrong in finding that the non-taking owners who did not have a viable market for their gas during the time period in question were adversely affected.
Finally, the Commissioner did not act arbitrarily and capriciously in ordering a cash accounting to protect the correlative rights of the non-taking owners. On appeal the taking owners argue that compelling them to render a cash accounting is unwarranted because they have done nothing "intentional or negligent" to infringe the correlative rights of the non-taking owners. The appellees' argument notwithstanding, we do not read the Louisiana Mineral Code as limiting the owners to redress for torts. The code provides that owners of a common reservoir have correlative rights and duties. LSA-R.S. 31:9. An owner of rights in a common reservoir may not use his rights to deprive another intentionally or negligently of enjoying correlative rights or to intentionally or negligently cause damage to the other's correlative rights. LSA-R.S. 31:10. However, what the appellees herein overlooked is that under Section 9 they have a duty to account for the gas they have taken from the common reservoir. Accountability for gas production from the common reservoir is not the same as liability for damages, and the duty to account exists even in the absence of a tortious act. The duty to account is the limitation of the correlative rights of the taking owners of which we spoke in our previous opinion. Amoco v. Thompson, supra. The redactors of the Louisiana Mineral Code made it clear that Section 10 was intended as a device to be used with flexibility by the courts in dealing with problems of correlative rights. LSA-R.S. 31:10, "Comment." Furthermore, a caveat is provided that if the power of the Commissioner is invoked and "the correlative rights of the parties are regulated or fixed by an administrative agency, the rule of private property in Article 10, limiting liability to intentionally or negligently caused damage, would not excuse the party for violation of the regulatory order." LSA-R.S. 31:10, "Comment." Thus, the Commissioner's decision to allow the non-taking owners a cash accounting was barred neither by the code nor the circumstances of this case.
Incongruous, indeed, would be a decision on our part which would dilute the power of the Commissioner to exercise his discretion. Previously having recognized and deferred to the expertise of the Commissioner and his department, we must be especially diligent in requiring a clear showing by those who challenge his order that his action was arbitrary and capricious. The record before us does not reveal that the appellees, Amoco, Chevron, and Energy, demonstrated that the administrative action was arbitrary and capricious.
Accordingly, we reverse the judgment of the district court and reinstate the Supplemental Order of the Commissioner of Conservation. Costs of this appeal are to be paid by the appellees, Amoco, Chevron and Energy.
REVERSED.

ON APPLICATION FOR REHEARING
On application for rehearing, Amoco complains that our opinion is in direct conflict with the Commissioner's Finding No. 6(i). However, our opinion considers the Commissioner's report as a whole, as we are required to consider all parts of his findings in relation to each other. The Commissioner concludes in Paragraph 7 that there was no viable market for the non-taking owners from 1983 through the end of 1985. This conclusion is based upon the record as a whole and does not conflict with any of his specific findings.
Furthermore, our statement on page 12 of our opinion that "there was no investor willing and able to build a pipeline and a *147 plant to capture the small amount belonging to the non-taking owners" was based upon the testimony taken at the rehearing on remand on September 26, 1988. However, our opinion also states that Amoco had the facilities to capture and market the gas. Consequently, the interpretation which Amoco places upon the inference we drew from the testimony is merely a matter of degree and has no bearing on the result we reached in our opinion.
REHEARING DENIED.
NOTES
[*] Judge Lewis S. Doherty, III, retired, is serving as judge pro tem by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.
[1] The criteria for reversal or modification are identical to the criteria provided in the Louisiana Administrative Procedure Act, LSA-R.S. 49:964 G(6).
[2] Despite a stipulation by the parties to the Commissioner, the district court judgment included the following:

Considering the evidence in the administrative record and the stipulation of the parties contained in that record, the Court finds, in accordance with its Oral Reasons for Judgment, that the gas remaining in each unit is enough to provide each owner with his fair share of gas production from the unit and that Finding Numbers 8 and 9 of the Supplement are in error.
Because of the stipulation, depletion was not at issue; the district court's finding in this regard was unnecessary.