644 So.2d 191 (1994)
HUNT OIL COMPANY, NWM/H-1982, and Energy Development Corporation, Plaintiffs,
v.
Hon. J. Patrick BATCHELOR, Commissioner of Conservation, Defendant, and
Tex/Con Oil and Gas Company, et al., Intervenors.
No. 93-C-3144.
Supreme Court of Louisiana.
October 17, 1994.
*193 Michael R. Mangham, George W. Hardy, III, Herman Edgar Garner, Jr., Lafayette, for applicant.
Robert T. Jorden, Charles B. Griffis, III, Lafayette, for respondent.
KIMBALL, Justice.[*]

FACTS AND PROCEDURAL HISTORY
On September 18, 1987, the Commissioner of Conservation of the State of Louisiana, by Order Nos. 745-H and 745-G, effective August 25, 1987, divided the Myogypsinoides Sand in the South Lake Arthur Field in Jefferson Davis and Vermillion Parishes, as originally defined in Order No. 745-C-2, into the Middle Myogypsinoides ("Myogyp") Sand (Order No. 745-H) and the Lower Myogyp Sand (Order No. 745-G), and created ten congruent gas condensate units in each. Order No. 745-H defined the unit described as the Midd Myogyp RA SU J and named the Sandefer-Marceaux No. 1 Well as the unit well. That same order created the Midd Myogyp RA SU H unit and designated the Sandefer-Sonnier Estate No. 1 Well as the unit well. After issuance of Order No. 745-G, which defined the unit described as the *194 Lower Myogyp RA SU J, the Sandefer-Boudreaux No. 1 Well was drilled as the unit well for that unit.
Acting on a request for revision of these units, the Office of Conservation conducted hearings on the potential revisions. These hearings, which began on September 25, 1989, and were concluded on October 18, 1989, resulted in the issuance, on January 22, 1990, of Order Nos. 745-G-3 and 745-H-5, effective October 18, 1989, which dissolved the previous units and created two new units. The new unit orders excluded some acreage which had been included in the old units, and included some acreage which had been excluded from the old units. This, in turn, significantly increased the unit ownership interests of the plaintiffs (Hunt Oil Company, NWM/H-1982, and Energy Development Corporation), and significantly decreased the ownership interests of the intervenors (Tex/Con Oil and Gas Company, Sandefer Oil & Gas, Inc., and SHV Oil & Gas Company). Because the Commissioner of Conservation's new orders were issued on January 22, 1990, but effective as of October 18, 1989, the date of the conclusion of the hearings on the revisions, the intervenors, who had previously owned significantly greater interests in the units as defined in the "old" unit orders automatically became "overproduced."[1] Conversely, the plaintiffs, who had previously owned significantly smaller interests in the units as defined under the "old" orders automatically became "underproduced."[2] The plaintiffs and intervenors "automatically" became underproduced and overproduced, respectively, because production from the units was allocated during the 96-day period between the close of the hearings[3] and the issuance of the revised unit orders (hereinafter referred to as "the critical period") to the parties pursuant to the "old" unit orders.
The allocation of the production pursuant to the "old" unit orders led to a substantial aggregate imbalance between the plaintiffs and intervenors of several million mmBtu's of gas. Specifically, under the "old" unit order, intervenors received 67.9% of the gas from the Lower Myogyp Unit during the critical period, but upon issuance of the "new" unit orders, were entitled to just 4.5% of the gas produced from that unit during that same period. Conversely, plaintiffs' interest in that unit increased from 9.2% under the "old" unit order to approximately 58% under the "new" unit order. As for the Midd Myogyp Unit, intervenors' interests were decreased from 68% to 45%, and plaintiffs' interests were increased from 9% to 26%.
Because there was no joint operating agreement and no gas-balancing agreement[4] between plaintiffs and intervenors, the large ownership changes combined with the retroactive entitlement to the plaintiff "underproducers" of the gas which had been allocated to, taken, and sold by the intervenor "overproducers" during the 96-day critical period, led the plaintiff underproducers to file an application with the Commissioner of Conservation for an order requiring the overproducers to remedy the imbalance through a cash *195 accounting. Specifically, the plaintiff underproducers requested that the Commissioner order that the imbalance be corrected by payment, in cash, from the overproducers to the underproducers of the proceeds received by the intervenors for that gas taken and sold during the critical period which was in excess of the amount allocable to the intervenors under the "new" unit orders. Pursuant to this request, a hearing was held on January 16, 1991, before the assistant secretary of the Office of Conservation.[5] By Order Nos. 745-G-4 and 745-H-6, issued April 3, 1991, and effective January 16, 1991, the Commissioner denied plaintiffs' requested "balancing in cash"[6] method of correcting the imbalance and instead ordered the intervenors to correct the imbalance through "balancing in kind,"[7]i.e., in this case, by providing plaintiffs with 50% of their aggregate allocable production under the "new" unit orders until such time as the imbalance had been corrected.[8] The plaintiff underproducers requested a rehearing from the Commissioner, but said request was denied.
On July 29, 1991, plaintiffs filed a petition for judicial review of the Commissioner's orders regarding correction of the imbalance, seeking to have the court set aside Order Nos. 745-G-4 and 745-H-6 and order the overproduced parties account to the underproduced parties in cash. The petition was answered by the Commissioner and the overproduced parties filed a petition of intervention. The Commissioner and Intervenors both sought to have the court affirm Order Nos. 745-G-4 and 745-H-6. Finding that the plaintiff underproducers had no viable market for their allocable production and that the Commissioner had failed to properly apply the controlling precepts contained in Amoco Production Company v. Thompson, 516 So.2d 376 (La.App. 1st Cir.1987), writ denied, 520 So.2d 118 (La.1988), and Amoco Production Company v. Thompson, 566 So.2d 138 (La.App. 1st Cir.), writ denied, 571 So.2d 627 (La.1990), the trial court issued judgment on September 4, 1992, reversing the Commissioner's orders and ordering the matter remanded to the Commissioner for balancing in cash.
The Commissioner timely perfected a suspensive appeal and the intervenors timely perfected a devolutive appeal to the First Circuit Court of Appeal. On November 24, 1993, the court of appeal affirmed the trial court judgment, finding, however, that the plaintiff underproducers were entitled to balancing in cash not because they lacked a viable market, but because the Commissioner's orders which called for balancing in kind would first, "take an inordinate amount of time for the overproduced owners to provide enough makeup gas to get the underproduced parties in balance," second, that "[i]n addition, balancing in kind would be unfair and unjust in this case because plaintiffs would further lose the time value of money," and third, that the inequity of the loss of the time value of money combined with "the uncertainty as to gas prices would adversely affect plaintiffs' rights to recover their just share without unnecessary expense."[9] Finding further that there would be no adverse consequences to the overproduced parties occasioned by balancing in cash, the court of *196 appeal held that "the Commissioner gave insufficient consideration to the private interests of all the parties involved in this case when he ordered a balancing in kind."[10] Finally, the court of appeal found that "plaintiffs carried their burden of proving facts justifying a cash accounting by a preponderance of the evidence," and that,
As such, the Commissioner was manifestly erroneous in failing to find as fact that balancing in kind would adversely affect the rights of plaintiffs to obtain their just and equitable share without unnecessary expense. Plaintiffs amply demonstrated that a cash accounting is the only practical remedy which would protect the correlative rights of the affected parties. Moreover, the Commissioner was clearly arbitrary and capricious in concluding that balancing in kind was appropriate under the unusual circumstances of this case.[11]
Recognizing the importance of stability and predictability in the oil and gas industry in Louisiana, we granted writs[12] to consider the correctness of the court of appeal's decision.

ISSUE
Whether, under the particular facts of this case, the plaintiff underproducers are entitled to a cash accounting by the intervenor overproducers to correct the existing production imbalance.

LAW

The Authority of the Commissioner of Conservation
1940 La.Acts No. 157, as amended, constitutes Louisiana's basic conservation law with respect to the oil and gas industry.[13]See La.R.S. 30:1-78. Pursuant to the Conservation Law,
The Commissioner has the general power and "authority over all persons and property necessary to enforce effectively the provisions of this Chapter [La.R.S. 30:1-78] and all other laws relating to the conservation of oil and gas." He has specific investigative powers to determine whether or not "waste" exists or is imminent and the general authority to establish whatever rules, regulations, and orders are necessary to prevent it and enforce the conservation laws. In recognition of the physical factors involved in the production of hydrocarbons, the Commissioner is also given the specific power to establish a drilling unit or units for each pool.... [T]he Commissioner is authorized to "require" unwilling owners to pool their interests if he finds it necessary to prevent waste or to avoid drilling unnecessary wells. (Emphasis in original) (Notes omitted).
Nunez v. Wainoco Oil & Gas Co., 488 So.2d 955, 961 (La.1986).
The Commissioner has jurisdiction and authority over all persons and property necessary to enforce effectively the provisions of the Conservation Law and all other laws relating to the conservation of oil and gas. La.R.S. 30:4 A. The Commissioner has the authority to make any reasonable rule, regulation and/or order that is necessary to properly administer and enforce the Conservation Law. La.R.S. 30:4 C. Specifically, the Commissioner has the power to make any rule, regulation and/or order necessary to (a) prevent wells from being drilled, operated or produced in a manner which causes injury to neighboring leases or property, (b) limit and prorate the production of oil or gas or both for the prevention of waste, and (c) regulate the spacing of wells and establish drilling units. La.R.S. 30:4(C)(3), (11) and (13). The Commissioner has the power to establish compulsory units and designate unit operators therefor. La.R.S. 30:9(B) and 30:10(A).
The primary duty of the Commissioner is to prevent waste of the state's mineral *197 resources by exercising his authority to promote the full and efficient development of these resources. La.R.S. 30:2, 3 and 4. In the exercise of this duty, the Commissioner has the power to form compulsory drilling and production units "to prevent waste or to avoid drilling unnecessary wells." La.R.S. 30:10(A)(1). All orders forming compulsory units "shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense." La.R.S. 30:10(A)(1)(a). The Commissioner may fix production allowables, but, in doing so, "shall prorate the allowable production ... so that each producer will have the opportunity to produce or receive his just and equitable share, subject to the reasonable necessities for prevention of waste." La.R.S. 30:11(B). (Emphasis in original).
Amoco Production Company v. Thompson, 516 So.2d 376, 388-89 (La.App. 1st Cir.1987), writ denied, 520 So.2d 118 (La.1988).
As the above quotations, and the statutory citations therein, demonstrate, the authority and responsibility for conserving Louisiana's oil and gas resources are virtually entirely vested in the office of the Commissioner of Conservation, Department of Conservation. The Commissioner's authority, as explained in Amoco Production Company v. Thompson, 516 So.2d 376 (La.App. 1st Cir.1987), writ denied, 520 So.2d 118 (La.1988), necessarily encompasses the power to partition the gas produced in compulsory units and, where necessary, to order balancing among the owners when an imbalance occurs.

The Amoco Decisions
In Amoco Production Company v. Thompson, 516 So.2d 376 (La.App. 1st Cir.1987), writ denied, 520 So.2d 118 (La.1988) (hereinafter "Amoco I"), and Amoco Production Company v. Thompson, 566 So.2d 138 (La. App. 1st Cir.), writ denied, 571 So.2d 627 (La.1990) (hereinafter "Amoco II"), the court of appeal was faced with the same issue as that presented herein, i.e., the proper resolution where a substantial gas imbalance had arisen in the absence of a joint operating agreement or a gas balancing agreement between the owners of a compulsory unit. Though the manner in which the gas imbalance arose in the Amoco dispute was different, both the parties herein and the lower courts correctly recognized that the analysis of the issue presented in this case is the same. It is therefore necessary to examine the Amoco decisions in some detail before resolving this particular dispute.
In the Amoco cases, the court of appeal was presented with the issue of the proper method of correcting a gas imbalance where the owners in a compulsory unit had failed to enter into either a joint operating agreement or a gas balancing agreement. The operator, Amoco Production Company, as well as two non-operator owners, had taken their production "in kind." The remaining owners in the unit did not elect to take their share of production in kind, and also did not enter into operating or balancing agreements with Amoco or the other mineral owners for the future sale of gas production. Amoco entered into a contract to sell its portion of the gas production to a gas transmission and marketing company. Amoco then began delivering all of the gas produced (less that delivered to the non-operators who had elected to take their share of production in kind) to its purchaser. After a change in market conditions, Amoco's purchaser notified Amoco that it would no longer accept delivery of any gas other than that contracted for, i.e., the purchaser would only accept delivery of Amoco's share of production. Thereafter, dispute arose when Amoco applied to the Commissioner for an order which would allow it to separately market its share of production from the field and balance in kind the share of the non-marketing owners at a later date. The non-marketing owners who had not elected to take their share of production in kind demanded instead that Amoco correct the imbalance which had resulted while Amoco had delivered all production to its purchaser through payment in cash of the amounts received by Amoco for the gas sold which was attributable to the non-taking owners. See Amoco I, 516 So.2d at 379-382.
*198 After reviewing the authority and the jurisdiction of the Commissioner over the operations of and gas produced from a compulsorily unitized field, as well as the nature of ownership of gas produced from such a field, the court in Amoco I held: 1) that the gas produced from a compulsory unit is owned in indivision, such that the Commissioner's and the trial court's application of the "molecular" theory of ownership of the gas was correct; 2) that the pertinent Louisiana Mineral Code provisions and statutes governing the Commissioner of Conservation establish an owner's right to his share of the production, and the Commissioner has the authority through issuance of compulsory unit orders to effect a partition of the gas produced in the unit; 3) that while the preferred method of such partition of the gas produced is in kind, the Commissioner has the power under certain circumstances to order alternative methods of partition; 4) that the Commissioner has the power to order balancing where partition has occurred and the owners have not received their allocated share in kind; and 5) that in partitioning the gas produced from a compulsorily unitized field or in ordering gas balancing to correct any imbalances which may arise, the preferred method of partition or balancing is in kind.
However, in conjunction with its holding that balancing in kind is the preferred method for partitioning the gas or correcting any imbalances which may arise, the Amoco I court also held:
If taking in kind by an owner (1) causes waste [La.R.S. 30:2, 3], (2) precludes another owner from recovering or receiving his just and equitable share [La.R.S. 30:10(A)(1)(a)], or (3) infringes on the correlative rights of another owner by limiting his liberty to enjoy his rights or causes damage to him [La.R.S. 31:9, 10, and 11], the Commissioner has the authority to modify or deny the right to take in kind.
* * * * * *
If the actions of an owner adversely affect the ability of a co-owner to get his share, an accounting in kind (by volume balancing) or an accounting in cash may be necessary for the affected owner to get his fair share. If, in taking their share in kind, some owners deplete the unit, then those owners who did not get their share in kind prior to depletion may be entitled to a cash accounting. However, if the unit is not depleted and the gas remaining in the unit is enough to provide each owner with his fair share (if properly balanced), then a balancing in kind may be appropriate. It is implicit in the obligation of the Commissioner to issue orders affording each owner the right to recover his just and equitable share, that the Commissioner can order an accounting in kind for balancing purposes or an accounting in cash (if such is the only available practical relief).
* * * * * *
Thus we hold that the Commissioner has the authority to order an accounting either in kind or in cash, depending on the circumstances.
Amoco I, 516 So.2d at 393-394.
We agree with the Amoco I court that balancing in kind is the preferred method of correcting any imbalances which may arise between owners in a compulsorily unitized lease. It has long been the custom of the industry for the owners to correct any imbalances which may arise through balancing in kind,[14] and absent any contractual arrangement to the contrary among the owners, there is no reason to alter this established practice. We also agree with the Amoco I court's determination that balancing in kind is not the only method which may be *199 employed to correct any production imbalances which may arise, and that depending on the particular circumstances presented, the Commissioner has the authority to order either balancing in kind or balancing in cash.
After acknowledging the expertise and primary responsibility of the Commissioner of Conservation in deciding such matters, the court in Amoco I remanded the matter to the Commissioner for reconsideration of the issues presented in light of the court's decision. On remand, the Commissioner determined that because a viable market for the non-taking owners' share did not exist during part of the time period at issue, balancing in cash should be made by the overproduced owners for that time period. See Amoco II, 566 So.2d at 143. The overproduced parties then sought judicial review of the Commissioner's decision. Id. at 144. The trial court reversed the Commissioner's decision, concluding that the Commissioner had misinterpreted the court's decision in Amoco I and erroneously ordered balancing in cash to correct the existing imbalance.
On appeal, the court reinstated the Commissioner's order, finding first, that it was the trial court that had misinterpreted the court's decision in Amoco I, and second, that the trial court had applied an improper standard of review to the Commissioner's decision. Amoco II, 566 So.2d at 144-146. Regarding the proper standard of review, the Amoco II court held:
Reviewing courts should not reverse a substantive decision by the Commissioner on its merits, unless it be shown that the balancing of costs and benefits performed by the Commissioner was achieved arbitrarily or with insufficient consideration of public and private interests. See Save Ourselves Inc. v. Louisiana Environmental Control Comm., [452 So.2d 1152 (La. 1984)]. "The manifest error test ... is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion." Save Ourselves, Inc. v. Louisiana Environmental Control Comm., supra at 1159.
Amoco II, 566 So.2d at 145 (Citation added).
Therefore, after review of the Commissioner's findings as though they were before the court on initial judicial review, the Amoco II court concluded that the Commissioner was "not clearly wrong" in his factual findings and that the Commissioner "did not act arbitrarily and capriciously in ordering a cash accounting." Id. at 146. For purposes of the instant case, we note that the Amoco II court also stated:
Incongruous, indeed, would be a decision on our part which would dilute the power of the Commissioner to exercise his discretion. Previously having recognized and deferred to the expertise of the Commissioner and his Department, we must be especially diligent in requiring a clear showing by those who challenge his order that his action was arbitrary and capricious.

Amoco II, 566 So.2d at 146 (Emphasis added).

DISCUSSION
As we previously noted, see supra, note 3, the cause of the existing gas imbalance in the instant case is, in part, attributable to the fact that, contrary to the requirement of La.R.S. 30:6(F), the Commissioner's decision revising the unit orders at issue herein took more than the 30 days specified in the statute.[15] We find, however, that this fact is of no consequence in the proper resolution of this matter. First, as a matter of law, the Commissioner's failure to comply with the statute and promulgate his orders within the specified thirty day period does *200 not provide a basis for invalidation of the Commissioner's orders. Instead, the parties' remedy is provided for within the statute: La.R.S. 30:6(F) provides that "[I]n the event of failure or refusal of the commissioner to issue an order within the period of thirty days, he may be compelled to do so by mandamus at the suit of any interested person." Second, though the length of time the Commissioner took to issue the revised orders in this particular instance did cause the resulting imbalance to be some three times larger than it would have been had the Commissioner complied with the statute, the fact remains that even when the Commissioner complies with the statute, substantial production imbalances will still occur. Therefore, we believe as a matter of practical concern that it is necessary to render a decision in this case which will control the proper resolution of gas balancing disputes which arise in the absence of a joint operating agreement or gas balancing agreement, regardless of the manner by which the imbalance arises.[16]
We begin the analysis by recognizing that the Commissioner's findings of fact are entitled to great weight by a reviewing court and, unless manifestly erroneous or clearly wrong, should not be reversed. Save Ourselves, Inc. v. Louisiana Environmental Control Comm., 452 So.2d 1152 (La.1984). Furthermore, in reviewing the conclusions and exercises of agency discretion by the Commissioner, the reviewing court must apply the arbitrariness test, and the party challenging the Commissioner's decision must make a clear showing that the administrative action was arbitrary and capricious. Id. In Amoco II, the court of appeal noted:
It is fundamental that the district court must not weigh de novo the evidence presented to the Commissioner and substitute its judgment for that of the Commissioner.... Regrettably, it appears that the court below did exactly what it is powerless to do.
Amoco II, 566 So.2d at 145.
After review of the record, we believe that the lower courts in the instant case have made the same mistake as the trial court in the Amoco II, case; they have substituted their judgment for that of the Commissioner. In the instant case, the Commissioner of Conservation made the following findings:
4. That the evidence presented at the hearing discloses:
* * * * * *
c. That balancing by accounting in kind on a unit by unit basis would require an excessive period of time, but balancing by accounting in kind by utilizing the three wells in question could be accomplished within a reasonable time with a fifty (50) percent rate.
d. That the gas imbalance did not result from lack of a viable market by any interested owner.
5. That accounting in kind is the preferred method of correcting a gas imbalance, and any owner desiring some other method, such as accounting in cash, must show that accounting in kind would adversely affect his right to receive his just and equitable share and adversely affect his correlative rights.
6. That considering all of the evidence submitted herein, the applicants have failed to meet the required burden of proof necessary to deviate from the preferred accounting in kind.
Order Nos. 745-G-4 and 745-H-6, State of Louisiana, Office of Conservation, dated April 3, 1991.
Pursuant to these findings, the Commissioner ordered:

*201 1. The applicants' request for accounting in cash to remedy the gas imbalance created during the critical period between October 18, 1989 and January 22, 1990 is denied.
2. The gas imbalance is to be remedied by accounting in kind, to be accomplished by allocating proportionately fifty percent (50%) of the overproduced owners' share of the aggregate production from the MIDD MIOGYP RA SUH; Marceaux No. 1, MIDD MIOGYP RA SUH; Sonnier No. 1 ALT, and the L MIOGYP RA SUH; Boudreaux No. 1 to the underproduced owners until completely and fully balanced.
3. Should full recoupment by any underproduced owner not be accomplished prior to depletion of the said three wells, the overproduced owners then should make a cash accounting to the underproduced owners for the unrecovered share on the basis of the current market price at the time of depletion, or on the basis of the price received at the time of (sic) the unrecovered underage occurred, whichever is the lesser amount.
4. Should any overproduced owner no longer own an interest in the production from the three said wells because of the unit revisions pursuant to Office of Conservation Order Nos. 745-G-3 and 745-H-5, said overproduced owner shall account proportionately to each underproduced owner based on the price received, on a month to month basis, and in cash.
* * * * * *
8. This Order shall not be construed to supersede or interfere with any contractual arrangements between or among any owners relative to the accounting for unit production, nor with the application of LSA-R.S. 30:10(A)(3) relative to unleased interests.
Id.
The trial court, applying the Amoco I analysis, see supra, found that because they were unable to obtain their just and equitable share of production due to the allocation of the production under the existing orders during the critical period, the underproduced owners lacked a "viable market" for their gas, and were therefore entitled to balancing in cash on the basis of the price received for the production by the overproducers during the critical period. The court of appeal correctly rejected this analysis, noting that the record clearly contained testimony by the underproduced parties' witness that a market existed for the underproduced owners' share of production if they had been allowed to take it, and that the concept of "viable market" concerned situations where the non-taking owners could not find anyone to buy their gas. Hunt Oil Company, 633 So.2d at 262. However, the court of appeal went on to affirm the result of the trial court, stating:
A reviewing court may reverse a substantive decision of the Commissioner if it is shown that the balancing of costs and benefits performed by the Commissioner was achieved arbitrarily or with insufficient consideration of public and private interests. Amoco II, at 145. The record from the hearings held before the Commissioner is fraught with testimony that a cash accounting is warranted in this case primarily because it would take an inordinate amount of time for the overproduced owners to provide enough makeup gas to get the underproduced parties in balance. In addition, balancing in kind would be unfair and unjust in this case because plaintiffs would further lose the time value of money. That fact and the uncertainty as to gas prices would adversely affect plaintiffs' rights to recover their just share without unnecessary expense. On the contrary, the overproduced owners marketed and sold gas which ultimately did not belong to them and "pocketed" the money from those sales. There was absolutely no evidence indicating that the interests of these overproduced owners would be adversely affected by a cash accounting in this case. Plaintiffs did not ask for interest on the money they are owed, and intervenors have reaped the time value of this money since late 1989. We find it clear that the Commissioner gave insufficient consideration to the private interests of all the parties involved in this case when he ordered balancing in kind.
After reviewing the entire record, we find that plaintiffs carried their burden of *202 proving facts justifying a cash accounting by a preponderance of the evidence. As such, the Commissioner was manifestly erroneous in failing to find as fact that balancing in kind would adversely affect the rights of plaintiffs to obtain their just and equitable share without unnecessary expense. Plaintiffs amply demonstrated that a cash accounting is the only practical remedy which would protect the correlative rights of the affected parties. Moreover, the Commissioner was clearly arbitrary and capricious in concluding that balancing in kind was appropriate under the unusual circumstances of this case.
Id.
The proper analysis to be applied in this case is that of Amoco I, i.e., given balancing in kind as the preferred method of correcting an imbalance, does balancing in kind in this particular case either: 1) cause waste; 2) adversely affect the rights of co-owners to take their just and equitable share of production in kind, without unnecessary expense; or 3) adversely affect the correlative rights of co-owners by limiting their liberty to enjoy their rights or causing damage to them. See Amoco I, 516 So.2d at 393, 395. This analysis is to be applied, initially, by the Commissioner of Conservation. On review by the courts, however, this analysis is to be applied within the confines of the proper standard of review. See supra.
In the instant case, the record clearly demonstrates that waste was not an issue. Instead, the underproducers maintained first, that balancing in kind would adversely affect their respective rights to receive their just and equitable shares of production without unnecessary expense, and second, that balancing in kind would adversely affect their respective correlative rights by causing damage to them. In support of their contentions, the underproduced owners submitted documentary and testimonial evidence to the Commissioner which purported to demonstrate that: 1) it would take an inordinate amount of time for the overproduced owners to make up the imbalance through balancing in kind; 2) if they had had an opportunity to sell the gas at issue, they had a readily available market for the gas and would have received a simple average price of $2.00 per mmBtu, the same price as that acknowledged as received by the overproducers; 3) the price of gas had declined immediately after the critical period to $1.65 per mmBtu and had a $1.70 per mmBtu price for the annualized period thereafter; and 4) because the critical period fell from October through January, it coincided with the time of the year that gas prices are at their highest. The underproducers also submitted evidence to the Commissioner purporting to show additional factors which the Commissioner should take into consideration, including: 1) evidence of the underproducers' obligation to pay royalties on the amount allocated to them by the revised orders; 2) evidence that these obligations created hardship for some of the underproduced owners; and 3) evidence of losses in the time value of money which the underproducers had sustained.
On the basis of this evidence, the underproducers argued to the Commissioner, he should find as fact that correction of the existing imbalance through balancing in kind would adversely affect the underproduced owners' ability to receive their just and equitable share of production without unnecessary expense. As we noted previously, the Commissioner found on the basis of the evidence submitted that balancing in kind could be achieved in a reasonable amount of time. See supra. There is evidence in the record that balancing in kind, by combining the production of the three well and allowing that production to be taken by the underproduced owners, will result in correction of the imbalance in approximately 22 months. Implicitly, then, the Commissioner found that balancing in kind over a 22 month period was not unreasonable. The Commissioner also found, on the basis of the evidence submitted, that the underproducers had failed to show that their respective rights to their just and equitable shares would be adversely affected or that their respective correlative rights would be adversely affected.
Our review of the record reveals that it contains substantial evidence to support the Commissioner's findings of fact. Furthermore, our review of the Commissioner's conclusions and exercises of discretion demonstrates *203 no arbitrariness and/or capriciousness. Therefore, and for the reasons which follow, we reverse the decisions of the lower courts and reinstate the Commissioner's Orders.
The record does not clearly demonstrate that the rights of the underproduced owners to receive their just and equitable shares without unnecessary expense will be adversely affected by balancing in kind. The underproduced owners' rights derive from La.R.S. 30:10(A)(1)(a), which states, in pertinent part, that all orders requiring pooling "... shall be made upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover his just and equitable share of the oil and gas in the pool without unnecessary expense." The phrase "just and equitable share" is defined in La.R.S. 30:9(D), as follows:
D. Subject to the reasonable necessities for the prevention of waste, and to reasonable adjustment because of structural position, a producer's just and equitable share of the oil and gas in the pool, also referred to as the tract's just and equitable share, is that part of the authorized production of the pool, whether it be the total which could be produced without any restriction on the amount of production, or whether it be an amount less than that which the pool could produce if no restriction on amount were imposed, which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool, in so far as these amounts can be practically ascertained. To that end, the rules, regulations, and orders of the commissioner shall be such as will prevent or minimize reasonably avoidable net drainage from each developed area, that is, drainage not equalized by counter drainage, and will give to each producer the opportunity to use his just and equitable share of the reservoir energy. In determining each producer's just and equitable share of the production authorized for the pool, the commissioner is authorized to give due consideration to the productivity of the well or wells located thereon, as determined by flow tests, bottom hole pressure tests, or any other practical method of testing wells and producing structures, and to consider other factors and geological and engineering tests and data as may be determined by the commissioner to be pertinent or relevant to ascertaining each producer's just and equitable share of the production and reservoir energy of the field or pool.

La.R.S. 30:9(D) (Emphasis added).
As the highlighted portions of the statute show, "just and equitable share" clearly refers to an owner's right to receive his fair share of the production in its physical form, i.e., the owner's actual share of the oil and/or gas; it does not mean the value of the owner's allocable share of the oil and/or gas produced.[17] Furthermore, when read in conjunction with this statutory definition of "just and equitable share," we believe that the phrase "without unnecessary expense," contained in La.R.S. 30:10(A)(1)(a), refers to unnecessary expenses for physical recovery of the gas, i.e., drilling costs, workover costs, etc., not, as the underproduced owners herein argue, to the lost time value of money.
The Commissioner found, in effect, that the underproduced owners had failed to submit evidence sufficient to carry their burden of proving that balancing in kind would adversely affect their respective rights to recover the just and equitable quantities of gas owed to them. There is testimony in the record which provides a reasonable basis for the Commissioner to find that balancing in kind would not adversely affect either the *204 underproduced or any of the other owners' recovery of their just and equitable share of the gas. As previously noted, evidence in the record demonstrates that balancing in kind will correct the existing imbalance in approximately 22 months, and the Commissioner explicitly found that balancing in kind could be accomplished within a reasonable amount of time.
Given the Commissioner's findings, the support for his findings in the record, and the proper standard of review to be applied to the Commissioner's findings and orders, we believe that the court of appeal erred in finding that "the Commissioner was manifestly erroneous in failing to find as fact that balancing in kind would adversely affect the rights of plaintiffs to obtain their just and equitable share without unnecessary expense." Hunt Oil Company, 633 So.2d at 262. The Commissioner found that balancing in kind could be accomplished within a reasonable amount of time. Given the Commissioner's authority to exercise his discretion in making determinations such as this one, which calls for judgment as to what period of time is "reasonable" in this industrya determination the Commissioner is qualified to make[18]we hold that the court of appeal improperly substituted its judgment for that of the Commissioner when it held that balancing in kind would take an "inordinate" amount of time. Hunt Oil Company, 633 So.2d at 262. Given the statutory definition of "just and equitable share," we also find that the court of appeal erred in concluding that the underproduced owners' evidence regarding the lost time value of money and the uncertainty as to gas prices was relevant to resolution of the issue of whether balancing in kind would adversely affect the underproduced owners' respective rights to receive their just and equitable shares of production.
First, as the court of appeal noted, the underproduced owners did not ask for interest on the cash value of the gas produced during the critical period which was owed to them. Nor could they have done so: there is no statutory basis for such an award, as the underproduced owners' right is to receive the gas produced, not the proceeds of the gas. La.R.S. 30:10(A)(1)(a) and 30:9(D). Second, the uncertainty of gas prices should not have been considered by the court of appeal; the underproduced owners' right is to the gas, not the value of the gas. See supra; La.R.S. 30:10(A)(1)(a) and 30:9(D). The market for natural gas is extremely volatile, and the underproduced owners would undoubtedly have argued their absolute right to their share of the gas had gas prices increased, instead of declined, after the critical period.[19] Finally, we note that the situation presented by this case and others like it, e.g., Amoco I and II, was entirely within the ability of the owners to prevent. The owners could easily have entered into a gas balancing agreement or inserted a provision addressing the issue of imbalances in a joint operating agreement. The owners involved in the instant case failed to do so, despite the existence of case law and commentary which clearly demonstrates that owners not covered by a joint operating agreement or a gas balancing agreement proceed *205 at their own peril.[20] As is evident from the paucity of case law on the subject of gas balancing and the proliferation of commentary on the same subject,[21]most gas imbalances are resolved through the use of a gas balancing agreement among the owners.
We also find that the court of appeal erred in determining that "plaintiffs amply demonstrated that a cash accounting is the only practical remedy which would protect the correlative rights of the affected parties." Hunt Oil, 633 So.2d at 262. The correlative rights involved in this case are the respective property rights of both the underproduced and overproduced owners in the compulsory unit. These correlative rights consist of the owners' rights to obtain their respective shares of the reservoir energy without unnecessary expense, and the owners' rights not to have any co-owners' actions cause damage to the reservoir such that recovery of otherwise recoverable production is hampered or defeated.[22] Because depletion of the unit was not an issue in this case, and there was no showing by the underproduced owners that the overproduced owners' actions either have or will somehow cause damage to their ability to ultimately recover their just and equitable shares of the reasonably anticipated production from the unit, the Commissioner did not err in determining that the underproduced owners' correlative rights would not be infringed by balancing in kind.
In this case, the operator simply allocated the production from the unit under the existing unit orders, which were still in effect during the critical period. This was no more or less than the operator was required to do. Revision of the unit orders by the Commissioner did nothing more than cause the immediate existence of a production imbalance. It did not infringe in any way on the underproduced owners' correlative rights in the unit. As such, there is substantial evidence in the record in this case to support the Commissioner's determination that the underproduced owners' correlative rights will not be infringed by balancing in kind, and we therefore hold that the court of appeal erred in substituting its judgment for that of the Commissioner and determining that the underproduced owners' correlative rights would be infringed.
Finally, we find the court of appeal's holding that the Commissioner acted arbitrarily and capriciously in determining that balancing in kind was appropriate under the particular circumstances of this case to be erroneous. Given the evidence contained in the record and the applicable statutes and existing case law as noted herein, the Commissioner's actions and exercises of his discretion in this case were not arbitrary or capricious.
Therefore, for the reasons assigned herein, we find that the court of appeal erred in reversing the Commissioner of Conservation's Order Nos. 745-G-4 and 745-H-6, which called for balancing in kind by the overproduced owners to correct the existing gas imbalance. We therefore reverse the court of appeal, and reinstate the Orders of the Commissioner in this matter.

DECREE
The decision of the court of appeal is hereby REVERSED, and the Commissioner of Conservation's Order Nos. 745-G-4 and 745-H-6 are hereby REINSTATED.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Calogero, C.J., was not on the panel which heard and decided this case.

Judge Melvin A. Shortess, First Circuit Court of Appeal, sitting in place of Justice James L. Dennis.
[1] When one (or more) co-owner(s) of the production from a unit takes more than his allocable share of production from the unit, that co-owner is "overproduced" vis-a-vis his co-owners.
[2] When one (or more) co-owner(s) of the production from a unit takes less than his allocable share of production from the unit, that co-owner is "underproduced" vis-a-vis his co-owner(s).
[3] La.R.S. 30:6(F) requires that Commissioner of Conservation to take whatever action he deems appropriate with regard to revising the units "with all convenient speed and in any event within thirty days after the conclusion of the hearing." (Emphasis added). In the instant case, however, the Commissioner's revised unit orders were issued 96 days after the conclusion of the hearings on this matter. This, in turn, caused the resulting imbalance between plaintiffs and intervenors to be over three times the size which would have otherwise occurred had the dictates of the statute been followed. However, for the reasons contained herein, infra, this fact is not of any consequence in resolution of the instant case.
[4] A gas balancing agreement is an agreement whereby the various owners of a well, unit, or lease set forth the manner in which production from the well, unit, or lease will be balanced among the owners in the event that one or more of the co-owners takes more or less than his allocable share of production from the well, unit, or lease. See, e.g., A. Hoppe, Producer Gas Balancing, With and Without Formal Agreement, 42nd Annual Institute On Oil and Gas Law and Taxation, § 2.02[5], at 2-6, Southwestern Legal Foundation (1991).
[5] While the assistant secretary of the Office of Conservation conducted the hearing, the Commissioner of Conservation apparently reviewed the record of that hearing in formulating his order. As La.R.S. 30:6(B) provides, in pertinent part, that "[t]he commissioner, in his discretion, may designate a member of his staff to conduct public hearings on his behalf," there is no merit to plaintiffs' assertions that the Commissioner's factual findings in the orders which resulted from this hearing should not be given the same deference on review as a hearing conducted by the Commissioner himself.
[6] Balancing in cash is the correction of the production imbalance by payment from the overproducer to the underproducer for the value of the amount of gas by which the overproducer is overproduced.
[7] Balancing in kind is the correction of a production imbalance by the allocation of a percentage of the overproducer's allocable gas take to the underproducers until such time as the imbalance has been corrected and the parties are again "in balance."
[8] At the ordered 50% of aggregate allocable payback-in-kind rate, the evidence adduced at the hearing showed that correction of the imbalance would require approximately 22 months.
[9] Hunt Oil Co. v. Batchelor, 633 So.2d 259, 262 (La.App. 1st Cir. 1993).
[10] Id.
[11] Id.
[12] Hunt Oil Company, Et Al. v. Hon. J. Patrick Batchelor, 93-3144 (La. 3/18/94), 634 So.2d 843.
[13] Nunez v. Wainoco Oil & Gas Co., 488 So.2d 955, 961 (La.1986). For a detailed discussion of the history of Louisiana's conservation law, see Nunez, 488 So.2d at 959-962.
[14] See P. Martin, The Gas Balancing Agreement: What, When, Why, and How, 36 Rocky Mountain Mineral Law Institute, Chapter 13, § 13.03[3], at 13-29 (1990); H. Carver, Problems Arising From Lack of Access to Markets, 38 La. Mineral Law Inst. 319, 328 (1991) ("In any event, the custom of the industry is certainly that each owner is entitled to take his share of the gas and sell it and that the nontaking owner is then relegated to balancing in kind if gas is available or balancing in cash if it is not." (Citing Beren v. Harper Oil Company, 546 P.2d 1356 (Okla.Ct.App.1975); United Petroleum Exploration, Inc. v. Premier Resources, Ltd., 511 F.Supp. 127 (W.D.Okla.1980); Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d 1064 (5th Cir. 1990)).
[15] In fact, the Commissioner's revised unit orders were issued 96 days after the end of the hearing. In Order Nos. 745-G-4 and 745-H-6, the Commissioner's Orders concerning the method of partition and accounting for the revised units at issue, the Commissioner made the following finding:

4. That the evidence presented at the hearing discloses:
a. That the gas imbalance resulted in part from the necessary delay to evaluate the evidence after the hearing was completed, and the later promulgation of the order with an effective date as of the date the hearing was completed.
[16] We note that the legislature has statutorily resolved the gas imbalance issue where an unleased owner is involved. La.R.S. 30:10(A)(3), states:

(3) If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.
[17] This does not mean that an owner's right to his just and equitable share may only be satisfied by taking in kind. Where events occur which make it impossible for the underproduced owner to receive his just and equitable share in kind, he retains the right to receive his just and equitable share of the value of the gas in cash. We note that in the instant case, the Commissioner's Order Nos. 745-G-4 and 745-H-6 clearly provide that should depletion of the wells occur prior to completion of balancing in kind under the orders, or should any overproduced owner no longer own an interest in the production of the three wells at the time of the orders or thereafter, the underproduced owners will be entitled to a cash accounting.
[18] As the court stated in Amoco I, 516 So.2d at 395:

[T]he Commissioner has unique expertise in the field of mineral conservation. The Commissioner is particularly suited by his expertise to gather the necessary facts, weigh the various policy considerations and expeditiously make the initial determination of what is in the best interest of efficiently and fairly developing the state's mineral resources.
[19] Though the circumstances giving rise to the imbalance in the instant case do not warrant the consideration of any fault or ulterior motive on the part of any of the parties, consideration of the volatility of the market for gas and/or any increases or declines in the price of gas in other situations where gas imbalances arise has led some commentators to express the following views:

Such an owner may wish to have an opportunity to sell its share of gas later at a better price or it may hope to demand a share of the selling party's receipts; indeed, such an owner may wish to have it both ways, i.e., to have the opportunity to sell later at a better price than anyone today or if the better price never materializes to demand money from the selling parties.
P. Martin, supra n. 14, at 13-8. See also A. Hoppe, Producer Gas Balancing, With and Without Formal Agreement, 42nd Annual Institute On Oil and Gas Law and Taxation, § 2.03[2], at 2-8, Southwestern Legal Foundation (1991).
[20] See, e.g., Amoco I, supra; Amoco II, supra; Beren v. Harper Oil Co., 546 P.2d 1356 (Okla.Ct. App.1975); United Petroleum Exploration, Inc. v. Premier Resources, Ltd., 511 F.Supp. 127 (W.D.Okla.1980); Pogo Producing Company v. Shell Offshore, Inc., 898 F.2d 1064 (5th Cir. 1990); Saunders, Oil and Gas: Gas Balancing or Juggling? A Comprehensive Look at the Current State of Judicial and Contractual Resolution to Gas Balancing Problems, 41 Okla.L.Rev. 352, 356-357 (1988) ("Because case law addressing cash balancing is scarce, the common law principles governing gas balancing established in United and Beren are not very well developed. Parties relying on these principles to solve disputes are playing a game of Russian roulette.").
[21] See, e.g., P. Martin, supra n. 14, at 13-4 n. 1.
[22] See La.R.S. 31:9, 10, and 11.